Juan A. GONZALEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 57485.

Court of Criminal Appeals of Texas, Panel No. 2.

Sept. 26, 1979.

Rehearing En Banc Denied Oct. 31, 1979.

C. W. Robin Pearcy, San Marcos, for appellant.

William Rugeley, Dist. Atty. and John L. Jackson, Asst. Dist. Atty., San Marcos, Robert Huttash, State's Atty., Austin, for the State.

Before DOUGLAS, TOM G. DAVIS and DALLY, JJ.

OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for possession of more than four ounces of marihuana. Art. 4476–15, Sec. 4.05(a) & (b)(1), V.A.C.S. Trial was before the court and punishment was assessed at five years, probated, and a fine of $5,000.00.

Appellant challenges the constitutionality of the initial search of his residence, the subsequent arrest of his wife, and later search and seizure of marihuana at his home. These contentions require a detailed review of the evidence.

Warden Charles Talbert of the Texas Parks and Wildlife Department, testified that on January 7, 1977, at about 6:30 p. m. he received a call from a rural property owner reporting rifle fire immediately behind the appellant's house. Talbert stated that he had previously received reports of game violations concerning the appellant's residence, but that he had never arrested the appellant for game violations nor found evidence of violations on the appellant's property. Talbert called Warden Simpson to assist him, and the two drove to appellant's residence. When they arrived at the residence, it was dark.

Talbert first observed the appellant's property from the highway. From that vantage he observed no activity on the property. He then drove through an open gate to the residence and parked in the driveway. Talbert and Simpson got out of the car and knocked on the front door to determine if anyone was at home. Receiving no response, the game wardens went to the back door and knocked. Again they received no answer. No cars were parked near the residence nor were there other signs that anyone was inside.

Talbert was next asked, "what occurred then?" He responded:

"A. Then we began to just look around the place. We walked back around into the front yard and possibly back into the back yard. Just looking to see if we could find any evidence of game violations, whether

there may be a deer hanging up, or one that had been freshly killed, or something of this order."

Talbert and Simpson found no game violations.

Talbert then testified that:

"A. I found something that caught my attention. There was a weeded area. What would have been the back yard at one time was fairly high in grass and weeds which had not been mowed or anything, only a beaten path where automobiles had been driving around behind the house, also in front of the house; with the exception of a beaten path, a well-beaten path that was beat out to an old outdoor toilet.

"Q. All right.

"A. This caught my attention as to why so much traffic had been going to an old outdoor toilet which was in poor condition.

"Q. Did you go down that beaten path?

"A. Yes. I did.

"Q. When you arrived at the old outhouse, what did you discover or find, if anything?

"A. When I arrived there, I noticed the door was shut and the beaten path led immediately into the door of the outdoor toilet. Immediately on the ground, in front of that was residue which I believed to and knew to be marijuana leaves and marijuana stems, laying in front of the door.

" . . .

"Q. Did you see any other marijuana on the premises at that time?

"A. Yes. The building was in such condition that it had cracks, and holes, and so forth on it. I shined my flashlight in through a crack at the door, and inside was a large quantity of marijuana stacked in bags inside the building."

Talbert and Simpson left the residence and took up a surveillance position some 600 yards from the house. Talbert then radioed Hays County Deputy Sheriff Cary Young.

Deputy Young met Talbert and Simpson near the residence. Before Young's arrival, however, the appellant's wife and a friend had returned to the residence. Talbert and Young went to Judge Hoard's office in Dripping Springs to obtain a search warrant based on what Talbert had seen. Simpson continued the surveillance of the house.

While Young and Talbert were obtaining the warrant, the appellant's wife left the residence in her car accompanied by the friend. Talbert testified that:

"A. The search warrant was in the process of being issued at the time that we received the radio call back from Warden Simpson, that the car that we had seen and its occupants that had arrived at the house shortly there previous to this, was leaving the premises. I, myself, left the Judge's office in Deputy Young's automobile and proceeded back towards the house to assist the officer in the apprehension of the vehicle that was leaving the house. I encountered that vehicle and him in pursuit just west of Dripping Springs, what would be the western edge of Dripping Springs. They were east bound on 290 as I was going west bound."

Appellant's wife was stopped by Warden Simpson.

Warden Talbert, Deputy Young, and Hays County Deputy Sheriff Alfard Hohman all testified that they were not present when appellant's wife was stopped by Simpson. All three of these officers arrived later, but did not stay, nor did they testify as to what occurred on the highway where the appellant's wife was stopped. Each stated that while they were at the place where appellant's wife was stopped, they saw no one search the car.

Appellant's wife, Sylvia Gonzalez, testified that she was stopped by Warden Simpson. Simpson came to the window of the car and asked for her driver's license. He also inquired whether she knew that she was speeding. At that time Patrolman Fort of the Department of Public Safety arrived and parked in front of Sylvia's car.

According to Sylvia, Simpson then asked her to get out of the car. Sylvia complied and followed Simpson around to the other side of the car. Sylvia testified that another officer who had arrived in the same car as Patrolman Fort then began searching her car. This officer searched Sylvia's purse, which had been on the floorboard of the car, and found another valid driver's license in her maiden name in addition to the one she showed Simpson. The officers asked Sylvia to follow them to Judge Hoard's office.

Sylvia testified that she did not think that she was free to drive off and continue on her way once she was told to follow the officers to the judge's office. Deputy Young testified that she was under arrest when she came to Judge Hoard's office. Deputy Hohman testified that she was not placed under arrest until the subsequent search of her residence described below. Neither Patrolman Fort nor Warden Simpson testified at the hearing or trial.

Once at the judge's office, Sylvia was charged and fined for possession of two valid driver's licenses. See, Art. 6687b, Sec. 32(a)(5), V.A.C.S. According to her, she was asked to sign a consent to search form and was told by Deputy Young that if she did not sign the officers would "break into" her house anyway. At this time, Sylvia was in the judge's office with the judge and six other police officers. She signed the consent to search form.

Officer Young testified that he never told Sylvia that he would break into her house regardless of whether she consented to the search. He could not remember whether anyone told her the officers had already procured a warrant or would search the house regardless of her consent. Young stated that it was possible that someone told her. It is undisputed that prior to signing the form she was told that the officers had reason to believe that there was marihuana at her house.

Deputy Hohman testified that he had shown Sylvia the consent to search form and informed her that she did not have to sign it. There was conflicting testimony from the officers concerning at what point in the above events Sylvia was finally placed under arrest. There was also conflicting testimony at to when she was given the warnings provided for in Art. 15.17, V.A.C.C.P.

Six peace officers then drove to the house escorting Sylvia in her car. The officers searched the house and outbuildings, including the outhouse, and found approximately 30 pounds of marihuana at different locations. According to the officers, the search was conducted pursuant to the consent to search form, signed by Sylvia at Judge Hoard's office. Appellant was subsequently arrested and convicted of the present offense.

Appellant contends that the initial search by Talbert and Simpson was illegal. The State responds that the search of the premises was authorized by V.T.C.A. Parks and Wildlife Code, Sec. 12.103, and the marihuana found in plain view.

Sec. 12.103, supra, provides:

"To enforce the game and fish laws of the state and to conduct scientific investigations and research regarding wild game or fish, an authorized employee of the department may enter on any land or water where wild game or fish are known to range or stray. No action may be sustained against an employee of the department to prevent his entering on land or water when acting in his official capacity."

■ Both parties rely on the same Attorney General's opinion in support of their contentions. Tex.Atty.Gen.Op.No. V–22 (1947) interpreted provisions of Art. 919, V.A.P.C. (1925, repealed 1975), which are now contained in Sec. 12.103, supra. This opinion, as applicable here, stated that game wardens could enter upon any lands for the purposes enumerated in the statute without a search warrant. The opinion further stated, however, that the statute did not enable game wardens to search a dwelling or things connected therewith, such as gardens or outhouses, without a warrant. While Attorney General's opinions can be persuasive, they are not binding authority on the courts. Tussey v. State, Tex.Cr. App., 494 S.W.2d 866.

■ Regardless of the breadth of the statute relied upon by the State, every search must pass constitutional muster. The precise question presented here is whether the warden's warrantless search at the appellant's residence and the immediate surrounding buildings and land was unreasonable. To determine the reasonableness of the search, we must first characterize the intrusion.

Talbert testified that he initially went on the land to determine whether anyone was home. According to this testimony, he was not searching for anything, but instead trying to contact the occupants to investigate the report that had come to his attention.

To find that a search is unreasonable, we must first determine that the intrusion was in fact a search. We need look no further than our decision in Long v. State, 532 S.W.2d 591, for a definitive answer to this inquiry. In Long, the sheriff had gone to a rural residence to investigate several suspicious airplane flights from Long's property. The sheriff parked in the driveway and went to the front door and knocked. He received no response. He then went to the back door, and again received no response to his knock. As he came around the house to leave, he passed an open window from which the odor of marihuana was emanating. The sheriff procured a search warrant and returned to search the house.

This Court held that the initial inquiry in Long was not a search. That holding is applicable in the instant case. The wardens' attempt to contact the inhabitants of the house is not a search for contraband or evidence of the crime. See, Long, 532 S.W.2d at 594–95. Had the warden in the instant case seen the contraband as he returned to his car, Long would indicate that there was no illegal search. The warden did not turn to leave after receiving no

response to his inquiries. The present case and *Long* clearly diverge at this point. As is shown by Talbert's testimony, instead of leaving, he initiated a search for game violations.

We are not faced with the question of whether the warden would enter open fields or waterways to search. *See, Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; *Ochs v. State,* Tex.Cr.App., 543 S.W.2d 355. The initial search by the wardens involved the back yard at appellant's house. It has been held that the private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself. *See, United States v. Anderson,* 8 Cir., 552 F.2d 1296; *Fixel v. Wainwright,* 5 Cir., 492 F.2d 480; *Wattenburg v. United States,* 9 Cir., 388 F.2d 853. Therefore, we must determine whether this warrantless search of the area immediately behind appellant's house is constitutionally valid under the mandates of the United States Constitution and Texas Constitution. If the search is constitutionally invalid, reliance on Art. 12.103, supra, is of no avail.

In *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970), the Supreme Court was faced with the warrantless search of a residence incident to arrest. The Supreme Court observed that:

" . . . our past decisions make clear that only in 'a few specifically established and well-delineated' situations, *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, may a warrantless search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation. *Chimel v. California,* supra, 395 U.S. [752] at 762, 89 S.Ct. [2034] at 2039, 23 L.Ed.2d 685; *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59; *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153."

*Accord, McDole v. State,* Tex.Cr.App., 579 S.W.2d 7. As noted above, the term "residence" extends further than just the physical structure of the house. See, *Fixel v. Wainwright,* supra. The exceptions delineated in *Vale* are:

(1) consent;

(2) response to an emergency;

(3) hot pursuit of a fleeing felon;

(4) contraband in the process of being destroyed;

(5) contraband about to be removed from the jurisdiction.

399 U.S. at 34–35, 90 S.Ct. 1969.

In the present case, the State does not contend, nor do we find, that any of these exceptions existed at the time of the warden's initial intrusion.

The burden of proving the reasonableness of a warrantless search is on the State. *DeLao v. State,* Tex.Cr.App., 550 S.W.2d 289; *Hooper v. State,* Tex.Cr.App., 533 S.W.2d 762. The evidence at both the hearing and the trial is insufficient to discharge this burden. We find that the game warden's initial search of the grounds immediately surrounding the appellant's residence was unconstitutional under both the Fourth Amendment of the United States Constitution and Art. I, Sec. 9, of the Texas Constitution.

The State argues that although the initial search by Wardens Talbert and Simpson may have been unconstitutional, the subsequent search in which the marihuana was seized was lawful in that appellant's wife consented to the search. Appellant responds that the consent given by his wife was involuntary and the result of an illegal arrest.

Not all evidence which is the "fruit of the poisonous tree" requires application of the exclusionary rule. The test is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. If consent is sufficiently an act of free will to purge the primary taint

and produce the requisite degree of attenuation, the evidence will be admissible. *Armstrong v. State*, Tex.Cr.App., 550 S.W.2d 25; *Houlihan v. State*, Tex.Cr.App., 551 S.W.2d 719. The State has the burden of showing that the evidence was untainted by the initial illegal search. *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176; *Armstrong v. State,* supra.

■ In the instant case, the evidence is undisputed that appellant's wife signed the consent to search form after she was told by Officer Hohman that there was reason to believe that marihuana was in her home. The offense report prepared by Deputy Hohman was introduced into evidence. The report recites in pertinent part:

> "After Trooper Fort finished with Mrs. Gonzalez, I talked to her and asked her if she would sign a consent to search her property. She wanted to know why and I told her that we had reason to believe and did believe that there was marijuana on the property."

The State offered no evidence that the marihuana would have been discovered by means independent of the initial search or the consent. Furthermore, the State has failed to demonstrate any attenuating circumstances between the initial illegal intrusion and the subsequent consent to search. We conclude that the consent was the result of the continuous exploitation of the initial unconstitutional search. Therefore, we hold that appellant's motion to suppress the evidence seized by officers from his residence and outbuildings should have been granted.

The judgment is reversed and the cause remanded.