Juan Roberto GONZALEZ, Appellant,

v.

**STATE of Texas, Appellee.**

**Nos. 13–83–351–CR, 13–83–352–CR.**

Court of Appeals of Texas,
Corpus Christi.

Aug. 31, 1984.

Bobby Flores, McAllen, for appellant.

Rene Guerra, Dist. Atty., Edinburg, for appellee.

Before UTTER, BISSETT and YOUNG, JJ.

## OPINION

UTTER, Justice.

Appellant has perfected separate appeals from convictions for the possession of marihuana of over four ounces but less than five pounds,[1] our cause number 13–83–351–CR, and for the possession of heroin of an aggregate amount of less than 28 grams, our cause number 13–83–352–CR.[2] Appellant waived a jury trial for each cause and was found guilty of both offenses. He was sentenced to five years' imprisonment for each of the two offenses; the sentences were ordered to run concurrently.[3] Although appellant was separately indicted for the two offenses, both of which arose out of the same transaction, the two causes were combined for trial and were briefed together on appeal. Since identical issues are presented in both appeals, we have chosen to address appellant's contentions in a single opinion. Appellant appeals, alleging three grounds of error, each of which revolve around an alleged unconstitutional search and seizure. We reverse and remand for a new trial.

The record shows that, on October 19, 1982, at approximately 12:00 p.m., Officer Galindo received information in connection with a theft or burglary that had occurred approximately one week earlier. The information was given him by the party who had allegedly sold some of the stolen property to a third party. The information consisted of: (1) the third party's name ("Bruno"); (2) that Bruno was about 5'10" tall, had a dark complexion and a mustache and weighed approximately 200 pounds; and, (3) that Bruno was "around at" 1108 North 20th Street (appellant's house) and frequented that place often. Galindo was also told that he could find drugs at the residence. Galindo testified that the per-

---

1. We note that the indictment charged an offense under the constitutionally infirm version of the Texas Controlled Substances Act, TEX. REV.CIV.STAT.ANN., art. 4476–15 (Vernon Supp.1982), specifically Sec. 4.051(b)(4). However, we also note that the indictment before us also charged an offense under the Controlled Substances Act as it existed prior to its purported amendment by H.B. 730. Accordingly, the indictment complies with *Ex parte Crisp*, 661 S.W.2d 944 (Tex.Crim.App.1983).

2. The indictment charged an offense under the constitutionally infirm version of the Texas Controlled Substances Act, TEX.REV.CIV.STAT. ANN., art. 4476–15 (Vernon Supp.1982), specifically Sec. 4.04(c); however, it also charged an offense under the Controlled Substances Act as it existed prior to its purported amendment by H.B. 730, and, therefore, also complies with *Ex parte Crisp*, 661 S.W.2d 944 (Tex.Crim.App. 1983).

3. The trial court did not comply with the requirements of TEX.CODE CRIM.PROC.ANN. art. 42.01 as the "judgments" and "sentences" are not *signed by the trial judge.* However, the failure of the trial court to sign the judgment does not render it invalid, as the above emphasized language is directory rather than mandatory. *Patterson v. State*, 650 S.W.2d 453 (Tex.App. —Houston [14th Dist.] 1982, pet. ref'd). As such, the trial court's error does not affect this Court's jurisdiction to consider the appeal. In the future, however, it is recommended that the trial court comply with art. 42.01.

son, who provided him with the information, was not a confidential informant and had not provided him with information in the past. He also testified that some of this information later proved to be inaccurate.

At about 3:00 p.m. on that same day, and based upon the above information, Officers Galindo and McCrory proceeded to appellant's home in an unmarked vehicle. Neither of the officers were wearing uniforms, and they had not obtained either an arrest warrant or a search warrant prior to proceeding to appellant's house. Appellant's house was described as being in a residential neighborhood. The house abutted 20th Street and an alley, which ran behind the house. A fence ran between the alley and the garage, and the garage did not have a driveway. The front of appellant's house faced west, and the garage was situated on the back or east side of the house. The garage door was located on the south side of the garage and faced neither the street nor the alley. Immediately to the south of appellant's home was another house, and the two houses were separated by a fence. Exhibits tendered into evidence showed that appellant's house and garage, if not connected, at least adjoined one another. There was not a door connecting appellant's house and garage. The following diagram is helpful in understanding the layout of appellant's house.[4]

Officer Galindo testified that they first drove along 20th Street and passed by the front of the house and then drove behind the house through the alley. While driving through the alley, he observed someone, fitting the description of Bruno standing outside the garage. Galindo then drove back to the front of the house on 20th Street and parked. From that point he could still see the person that looked like Bruno. As Galindo approached him, the person, whom he believed might be Bruno, walked into the garage. The record does not reflect that Galindo shouted, called out or attempted to attract the person's attention by any other means. Galindo testified that the man did not see him at this point. Galindo then walked past the front door and side door of the house and proceeded directly to the back portion of the yard where the garage was located. There was no driveway or clearly defined walkway to the backyard. There, he observed appellant and three or four other guys "bunched

4. This diagram is composed from one admitted into evidence and drawn by Officer Galindo. It has been modified to show the garage next to the house, as shown by photographic exhibits, and to show the fences between appellant's house and his neighbor's yard and between the house and the alley.

up together in a circle." As he got closer, he looked into the garage and saw that they were weighing some marihuana. Appellant and the other men were arrested, and the marihuana was seized. After appellant had been handcuffed, Officer McCrory discovered a tinfoil packet containing 3/10 of a gram of 5% heroin in his hand.

Galindo further testified that, relative to the front yard and street, the front door was closer to the front yard and street than was the garage. While he did not have to pass through any gate or any kind of hindrance of any type to get to the garage, he was not invited onto the premises, and the house and the yard were not public places. He did not gain permission prior to going into the yard, and he did not attempt to go in front of the house to talk to anybody and did not knock at the front door or side door prior to approaching the garage. He was not at the house to respond to any type of emergency. Galindo further testified that he could not see what was going on in the garage from either the alley or the street. No drugs were in plain view from either the street or the alley. The only way he could see the drugs was to go onto the property and to stand by the garage door.

While the officers were awaiting transportation for the subjects, appellant's wife came out of the house. The officers then obtained a consent form from Mrs. Gonzalez and searched the house, discovering some marihuana and a tinfoil containing 44/100ths of a gram of less than 1% heroin. The morning after his arrest, while he was still in custody and without the advice of counsel, appellant gave a statement, implicated himself and admitted that the heroin and marihuana found in the house were his.

Appellant first contends that the trial court erred in failing to grant his motion to suppress because the heroin and marihuana, which were admitted into evidence, were seized contrary to the Fourth Amendment to the United States Constitution and TEX.CODE CRIM.PROC.ANN. art. 38.23

(Vernon 1979), in that there was neither a warrant nor probable cause.

■ The State relies on the "plain view" doctrine, coupled with a right to be on the premises in furtherance with an ongoing investigation. In *Bailey v. State*, 629 S.W.2d 189 (Tex.App.—Dallas 1982, pet. ref'd), the Court set forth that:

"A warrantless search and seizure is per se illegal, except for a few specifically established and well-delineated exceptions. One such exception permits evidence in plain view to be seized without a warrant. However, the doctrine of "plain view" has three criteria: (1) a prior justification for an intrusion; (2) an inadvertent discovery of incriminating evidence; (3) which is immediately apparent to the officer." [Citations omitted.]

*Bailey*, 629 S.W.2d at 191. "The question whether property in plain view of the police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question." *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). If the initial intrusion is justified, then the seizure of an object in plain view is permissible. *Brown*, at 460 U.S. ——, 103 S.Ct. 1541; *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

The State places undue weight on Officer Galindo's testimony that he did not enter appellant's premises with the intention to initiate an arrest or conduct a search. The central issue remains whether or not Galindo had a legal right to enter onto appellant's property and proceed to a location that would enable him to plainly view the incriminating evidence. The State relies on *Potter v. State*, 481 S.W.2d 101 (Tex.Crim. App.1972), to support its contention that Galindo did have such right.

In *Potter*, the defendant stood charged with theft of an automobile. The court found that the investigating officer, Detective Moryl, had probable cause to believe that the defendant was committing a misdemeanor (displaying a license plate on a vehicle other than that to which it was

properly registered) when he first observed appellant arrive at the house. The court further found that Moryl was entitled to lawfully enter onto the defendant's property to discuss the improperly registered vehicle with the defendant. Finally, the court found that, since he was lawfully on the premises, Moryl's looking into the garage windows and discovering the stolen automobile did not constitute an illegal search.

An important distinction between *Potter* and the case at bar is that, in *Potter,* the detective actually had probable cause to believe that a crime had been committed and proceeded immediately to investigate it; whereas in our case, Galindo entered onto appellant's property based solely on his belief that someone (Bruno), whom he saw there, *might* be someone who *might* be in possession of stolen property. In addition, instead of proceeding first to the front door or side door of appellant's house, Galindo went directly to the garage located at the rear of appellant's residence, an area protected against unreasonable searches. *Taylor v. United States,* 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932). *See Nordskog v. Wainwright,* 546 F.2d 69 (5th Cir.1977) (the court therein held that the officers' entry onto the property was a legitimate and appropriate action, where police officers, while conducting an investigation, were justified in proceeding to the rear of a residence to knock on a rear door *after* first knocking at the front door and receiving no response). *See also United States v. Anderson,* 552 F.2d 1296 (8th Cir.1977).

A case with facts, which are much closer to those before us, is *Smith v. State,* 139 Tex.Cr.R. 251, 139 S.W.2d 791 (1940), wherein the police went to the defendant's private residence for the purpose of looking for a man other than the defendant. As they drove to the house, they observed the defendant in a back room and saw him grab something from the table. One of the officers ran to the back of the house and observed the defendant pouring something (later shown to be whiskey from a container to which no tax stamp was affixed) from a pint bottle. The court reasoned that,

absent a warrant or knowledge that the defendant was, in fact, in violation of some law, the police were not authorized to conduct a search of a private residence.

In our case, if the police were unlawfully in appellant's yard at the time they discovered the commission of the offense, the arrest of appellant and the search of his residence cannot be upheld. *Taylor v. State,* 120 Tex.Cr.R. 268, 49 S.W.2d 459 (1932, Opinion on Motion for Rehearing). Under the facts before us, we find that Officer Galindo did not have a right to be in a position in appellant's yard by appellant's garage from which he could plainly view the marihuana, the possession of which was the basis for appellant's arrest and subsequent conviction. The fact that he had observed a person, whom he wanted to question, standing by the garage is not sufficient to warrant Officer Galindo's intrusion onto appellant's property in violation of appellant's Fourth Amendment rights. Appellant's first ground of error is sustained.

In his second ground of error, appellant argues that the trial court erred in admitting into evidence the heroin and marijuana found inside appellant's residence because the consent to search the residence given by appellant's wife was not given freely and voluntarily.

After placing appellant under arrest, Officers Galindo and McCrory conducted a warrantless search of appellant's residence; this search resulted in the discovery of additional marihuana and heroin. It is undisputed that there were several armed police officers on appellant's premises both before and during the time the consent to search was obtained from appellant's wife. Officer McCrory testified:

Q [Mr. Flores] Are you saying—are you telling us that during the time, throughout the whole incident, that you were present, Mr. Galindo was present, Mr. Segovia was present, Mr. Balli was present, Mr. Torres was present and how many other officers were present?

A [Officer McCrory] Okay. The officers were present because they had to assist in backing up and handcuffing the prisoners.

Q Okay. So how many officers were present?

A In the residence, myself, Galindo, Faires and later Investigator Segovia.

Q How many officers were present outside the residence?

A Torres, Balli, then we had units to transport the officers because they needed caged units and it was Officer Rodgers was one of the officers that transported.

Regarding her encounter with appellant's wife, Officer McCrory testified that:

She [Mrs. Gonzalez] came out and talked to Investigator Galindo and because I was trying to get communication with the police department to get other units to help us, and then I approached her when she was talking to them and she was saying that she was tired. That she was glad that he had been arrested because he used to do these things in front of the kids, and she was asked if she would sign a consent to search. Would she be willing to let us go into the house and she said, 'Yes.' We had two—we had one in English and she signed that and that was explained to her in Spanish because she could not read Spanish.[5] We felt it would be better so we obtained a second one in Spanish where she could know what she was reading and we waited and the other officer that arrived had one in Spanish and she signed both. This is the one that she signed in front of me.

\* \* \* \* \* \*

She signed that form on the kitchen table. She allowed us to go in and she signed the form and reread and were [sic] able to place it down.

Appellant's wife testified to the following:

"A [Mrs. Gonzalez] Well, I came out of my house and then is when I saw that.

Q [Mr. Flores] Did you initiate conversation with the police?

A No.

Q Do you recall what they asked you?

A Well, when I came out, they only told me to move to one side.

· \* \* \* \* \*

Q Did you take them inside your house?

A No. They told me we are going to check your house. He said, 'You will sign this paper for me,' and I will say, 'All right. I will sign it.'

\* \* \* \* \* \*

Q How many officers did you notice there at your house that day?

A About four. I don't recall how many.

Q Were you scared?

A Yes. Well, when I came out, they [sic] were guns and I didn't know who they were. They didn't identify themselves.

\* \* \* \* \* \*

Q Did you, at anytime, voluntarily take these police officers inside your house?

A No.

In *Gonzalez v. State*, 588 S.W.2d 355 (Tex.Crim.App.1979), in a factual situation similar to the case at hand where a warrantless search was conducted and a consent to search the premises was obtained from the defendant's wife, the Court of Criminal Appeals, in reversing the conviction, first determined that the investigating officer's initial search of the grounds immediately surrounding the defendant's residence was a prohibited intrusion on the defendant's property. In determining the admissibility of the marihuana, which resulted from the consent to search signed by appellant's wife, the Court decided that the consent was not given as an act of free will necessary to purge the primary taint of the initial warrantless search to produce the requisite degree of attenuation.

The State offered no evidence that the marihuana would have been discovered by means independent of the initial

---

**5.** Mrs. Gonzalez testified that she could read Spanish.

search or the consent. Furthermore, the State has failed to demonstrate any attenuating circumstances between the initial illegal intrusion and the subsequent consent to search. We conclude that the consent was the result of the continuous exploitation of the initial unconstitutional search. Therefore, we hold that appellant's motion to suppress the evidence seized by officers from his residence and outbuildings should have been granted.

*Gonzalez*, 588 S.W.2d at 361.

We find the reasoning in *Gonzalez* to be controlling under the facts presented in the case before us. *See also Paprskar v. State*, 484 S.W.2d 731 (Tex.Crim.App. 1972). The evidence, which was obtained as a result of the search, should have been suppressed since the consent did not sufficiently purge the primary taint of the initial illegal search. *See Armstrong v. State*, 550 S.W.2d 25 (Tex.Crim.App.1977, opinion on State's Motion for Rehearing).

Finally, appellant challenges the admission of his statement into evidence. Again, based upon the facts of the unwarranted intrusion on appellant's property, we find that the statement was the product of the prior illegal search and seizure. *United States v. Dunn*, 674 F.2d 1093 (5th Cir.1982), cert. granted, — U.S. —, 104 S.Ct. 2380, 81 L.Ed.2d 340 (1984). *See Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Appellant's second and third grounds of error are sustained.

The judgments of the trial court are REVERSED, and the causes are REMANDED.

BISSETT, J., not participating.