Opinion issued March 29, 2007 




 



 













In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00419-CR

____________


ROBERT ANTHONY PORTEOUS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 339th District Court

Harris County, Texas

Trial Court Cause No. 1014655






O P I N I O N

 A jury found appellant, Robert Anthony Porteous, guilty of the offense of
attempted capital murder of a peace officer (1) and assessed his punishment at
confinement for thirty-seven years and a $5,000 fine. In two points of error, appellant
contends that the trial court erred in (1) denying his motion to suppress evidence in
violation of the Fourth Amendment to the United States Constitution (2) and article I,
section 9 of the Texas Constitution (3) and (2) denying his request to instruct the jury
on the law of self-defense as applied to the offenses of attempted capital murder of
a peace officer and the lesser-included offense of aggravated assault of a public
servant. (4)

 We affirm.

Factual and Procedural Background

 Houston Police Department ("HPD") Officer R. Pinkerton, the complainant,
testified that, on January 24, 2005, he left his home in northwest Houston at
approximately 11:15 p.m. in order to arrive at work by midnight. As he drove to
work in his "personal vehicle," a gold Ford Explorer, he was wearing his HPD
uniform and a black jacket with "Police" in yellow letters across the front of the
jacket and "Houston Police" in yellow letters across the back of the jacket. Traveling
on Eldridge toward Highway 290, Pinkerton noticed, in his rearview mirror, a set of
headlights approaching "[v]ery, very, unusually fast." He looked to his side view
mirror and saw that the approaching car began to pass him. Pinkerton felt the car was
"cutting too close," so he "jerked [his] wheel over to the right to avoid the car." At
that point, he "felt a jolt" and thought that his Explorer had been hit. As Pinkerton
slowed his Explorer, the other car appeared to pick up speed. Pinkerton then
followed the car and saw it run a red light at a major intersection. Pinkerton
explained that he "changed from thinking like a citizen who just felt like [he] had just
been hit to now thinking like a police officer." As he continued the pursuit, Pinkerton
saw the car run another red light and make, at a four-way stop, a left-hand turn into
a residential neighborhood. When the car turned right out of the neighborhood,
Pinkerton saw that it slowed due to traffic. 

 After the car had stopped, Pinkerton stopped his Explorer fifteen to twenty feet
ahead of the car. He approached the car in a semi-circle, so that he came "around the
front of the vehicle to the back and then approached the vehicle" from behind. He did
this "so that if there's anyone in the vehicle, they have to . . . turn and look over their
shoulder." He noticed that the windows "were so tinted [he] couldn't see much of
anything" and "could barely make out the silhouette of the driver in the front seat of
the car." Pinkerton, who was wearing his HPD uniform and "raid jacket," which was
unbuttoned and "flared open," shouted, "Houston Police. Turn the ignition off." He
told the driver,"[l]et me see your hands." After the driver did not respond, Pinkerton
pulled out his firearm in the "low ready position," described as a "nonthreat position,"
and also referred to as the "bladed position." As he repeatedly shouted, "[l]et me see
your hands," he heard the glass of the car's window shatter and then felt the "first
round impact" his right arm. He then felt a second bullet hit his left arm, causing his
body to twist so that a third bullet struck underneath the back of his armpit. He
staggered back and fell to the ground as the car drove off. Pinkerton explained that
one of the bullets tore through the radial nerve of his left arm and another shattered
the bone in his right arm, requiring surgery and extensive physical therapy.

 Felicia Gonzales testified that, at the time of the shooting, she was living with
appellant at his parents' house. On the night of January 24, 2005, while at a friend's
home, appellant telephoned Gonzales and told her, "I just shot a cop." Gonzales hung
up the phone and soon thereafter called appellant, who told her that as he was driving
his mother's yellow Mitsubishi Lancer, an unmarked car attempted to stop him
because he was speeding. The driver cut him off in the road and ran up to his car. 
Appellant shot the man three times through the window. On cross-examination,
Gonzalez testified that appellant "did not know it was a cop when he had shot him." 
Appellant also told Gonzales that he was afraid that the man was going to shoot him.

 Christopher Barley, a friend of appellant, testified that on January 26, 2005,
after hearing the news from another friend, he called appellant to ask "if everything
was okay." Appellant told Barley, "No, not really. I shot somebody." Barley asked
appellant if he had been robbed, and appellant replied by saying, "No, and it was a
cop." Appellant told Barley that he was in his mother's yellow Mitsubishi Lancer
when he shot the man. 

 Harris County Sheriff's Homicide Detective D. Holtke, the lead detective on
the case, testified that appellant, after he was arrested, told him that he did not know
that Pinkerton was a police officer until he later saw it on the internet. However,
appellant's cellular phone records revealed that he called Gonzales on the night of the
shooting at 11:25 p.m.

 Prior to trial, appellant filed a motion to suppress evidence, alleging that his
arrest was the product of an illegal search. At the pretrial hearing on the motion,
HPD Officer B. McDaniel testified that on January 26, 2005, he began investigating
the shooting of Officer Pinkerton. Because the shooting occurred in northwest Harris
County, outside the Houston city limits, the Harris County Sheriff's Office became
involved in the investigation. From a surveillance video and witness statements,
Detective Holtke learned that the car driven by the shooter was a yellow Mitsubishi
Lancer. From his research, McDaniel learned that a yellow Lancer was registered at
an address in the general area of the shooting and that appellant had previously been
issued a traffic ticket in the yellow Lancer.

 At approximately 4:30 p.m. on January 26, 2005, McDaniel and his partner,
HPD Sergeant D. Ferguson, drove to the address to investigate whether the car was
still associated with that address. The lot in question was approximately eighty or
one-hundred "yards deep" and "[t]here were at least two houses sitting on that lot." 
McDaniel described the house in front as a "single story ranch style house." From
inside a car parked on the street, McDaniel noticed a yellow car backed into a
"carport or a stable" approximately seventy to seventy-five yards away in the back
northwest part of the property. A blue tarp covered part of the windshield and hood,
with the driver's side front fender, window, and door partially visible. After seeing
the car, McDaniel and his partner notified investigators from the sheriff's office and
left the scene to obtain binoculars and night vision goggles "to be able to look at the
residence better." Upon their return at 6:00 p.m., McDaniel was not able to get a
good view of the car because it was dark outside and there was a glare from a light
on a neighbor's property. 

 After sheriff's deputies arrived, the officers decided to knock on the door of the
front house in an attempt to locate the resident and to obtain permission to go onto
the property to see if the car "was the right vehicle." Along with McDaniel and his
partner, two sheriff's homicide investigators and two patrol deputies walked down
the driveway to the front door of the house. No one answered their knock, but they
saw that lights were on in the second house and it appeared to be occupied. Although
McDaniel did not specifically recall whether he had noticed the second house from
the street, it was clearly visible as the officers approached the house in front. They
approached the second house to knock on the door and hopefully find someone
present to consent to their examination of the car. As the officers walked down the
driveway to the second house, McDaniel, from approximately thirty to thirty-five feet
away, saw that the driver's side window was broken out of the yellow car. McDaniel
explained that he never got closer to the car than this thirty to thirty-five foot
distance. He also stated that one of the sheriff's deputies saw a handgun lying on the
seat of a truck parked directly in front of the second house. At that time, the officers
decided to leave the property and obtain a search warrant.

 McDaniel further testified that he did not see any "no trespassing" signs and
that the officers "did not go through a gate" to get to the second house. Although he
did not remember a gate, there "might have been" one closer to the second house. 
McDaniel explained that it became unnecessary to knock on the door of the second
house after the officers had identified two pieces of evidence that they felt provided
probable cause to secure a search warrant. After obtaining a search warrant,
McDaniel returned to the second house around midnight.

 Detective Holtke testified at the hearing that when the officers executed the
search warrant, Felicia Gonzales answered the door at the second house and appellant
was inside the house. Holtke explained that although the officers did not cross
through a fence to get onto the property, the back house was gated, with a truck
parked outside the fence. To get to the front door of the second house, the officers
had to pass by the truck and then go through an unlocked gate.

 Pamela Porteous, appellant's grandmother, testified that at the time of the
shooting, she was living in the front house on the property and appellant, his parents,
and a sibling lived in the back house on the property. She explained that the two
houses shared one mailbox, the rear house did not have its own mailbox, and there
was not a "½" address mark identifying the rear house. Ms. Porteous also explained
that the driveway to the second house is "private property" and that appellant and his
family had an easement to use the driveway. She stated that there is no lighting from
neighboring homes that would illuminate the area in back of the front house. 
Moreover, a ten-foot tall chain-link fence, with barbed wire on top, "encompasses
[her] whole house," and a five or six-foot fence encompasses the rear house. She
noted that the gate to the second house is "[c]losed and most of the time locked
because [her] dog knows how to open it." However, she did not know whether the
gate was locked in January 2005. 

 At the conclusion of the hearing, the trial court denied appellant's motion to
suppress.Motion to Suppress Evidence

 In his first point of error, appellant argues that the trial court erred in denying
his motion to suppress evidence "found by police officers who trespassed onto private
property in order to obtain evidence supporting the request for a search warrant"
because "the officers had to enter through a ten-foot chain link fence in order to go
onto the property at all." He asserts that the fence "gave notice, even without signs,
that the property was not open to the public" and, "[o]nce on the property, officers
had no justification for going to the house in back, because it was completely fenced
off, with a closed and locked gate." Appellant also argues that the officers engaged
in an illegal search because "after entering the property, the officers veered off the
path to the second house . . . to look at the yellow car."

 In response, the State asserts that the police officers "legitimately entered the
property by the usual route with the intention of knocking on [a]ppellant's front door
and observed the evidence in plain view." The State notes that "no sign, fence or gate
demonstrated that [a]ppellant intended to keep the [second house] private and
protected from entry."

 Our standard for reviewing a trial court's ruling on a motion to suppress
evidence is bifurcated; we give almost total deference to a trial court's determination
of historical facts and review de novo the court's application of the law. Maxwell v.
State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). In reviewing a ruling on a
question of the application of law to facts, we review the evidence in the light most
favorable to the trial court's ruling. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997). At a suppression hearing, the trial court is the sole and exclusive trier
of fact and judge of the witnesses' credibility. Maxwell, 73 S.W.3d at 281. 
Accordingly, the trial court may choose to believe or to disbelieve all or any part of
the witnesses' testimony. State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

 The Fourth Amendment of the United States Constitution and section I, article
9 of the Texas Constitution protect against unreasonable searches and seizures. 
Atkins v. State, 882 S.W.2d 910, 912 (Tex. App.--Houston [1st Dist.] 1994, pet.
ref'd). This protection includes a home and the curtilage of the home as well. Oliver
v. United States, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742 (1984); see also Gonzalez
v. State, 588 S.W.2d 355, 360 (Tex. Crim. App. 1979); Atkins, 882 S.W.2d at 912. 
Whether a particular area is included within the curtilage of a home is determined by
whether a defendant had a reasonable expectation of privacy in the area. Bower v.
State, 769 S.W.2d 887, 896 (Tex. Crim. App. 1989), overruled on other grounds by
Heitman v. State, 815 S.W.2d 681, 685 (Tex. Crim. App. 1991); Atkins, 882 S.W.2d
at 912. Factors considered are the proximity of the area to the home; whether the area
is included within an enclosure surrounding the home; the nature of the use to which
the area is put; and the steps taken to protect the area from observation by a passerby. 
United States v. Dunn, 480 U.S. 294, 301, 107 S. Ct. 1134, 1139 (1987); Atkins, 882
S.W.2d at 912. There is no reasonable expectation of privacy if the activity viewed
by an officer is visible from the street or the curtilage is open to the public. Bower,
769 S.W.2d at 897; Atkins, 882 S.W.2d at 912.

 In support of his argument that the officers' entry onto the property was
"unjustified and illegal," appellant relies on Gonzales v. State, 588 S.W.2d 355 (Tex.
Crim. App. 1979) and Livingston v. State, 731 S.W.2d 744 (Tex. App.--Beaumont
1987, pet. ref'd). Both cases are readily distinguishable from the instant case. In
Gonzales, two game wardens went to the front door of a residence, then went to the
back door of the residence to knock and determine if anyone was home. 588 S.W.2d
at 357. After receiving no answer at the back door, the wardens began "to just look
around the place" for evidence of game violations. Id. Although they found no game
violations, the wardens found marijuana present on the premises. Id. This searching,
rather than returning to their car, made it an illegal warrantless search. Id. at 359-60.

 In Livingston, a private citizen, the owner of a wrecking yard that had been
burglarized, contacted a sheriff's deputy to approach the defendant for questioning. 
731 S.W.2d at 745. The private citizen met with the deputy in front of the
defendant's mobile home. Id. While the deputy remained in his car, after recognizing
a stolen tire and wheel, the private citizen knocked on the door and received no
answer. Id. As he was leaving, he noticed a tailgate leaning against an open wooden
shed that was attached to the end of the mobile home. Id. He approached the shed
and, by looking through an opening, discovered more property. Id. Along with two
deputies, the private citizen went into the shed, and they also examined a truck
nearby. Id. The court held that these activities, including entering the shed,
constituted an illegal search and seizure. Id. at 747. 

 More on point is Long v. State, 532 S.W.2d 591 (Tex. Crim. App. 1976). In
Long, a sheriff had gone to a rural residence to investigate reports of several
suspicious airplane flights from the defendant's property. Id. at 592-93. The sheriff
parked in the driveway of the residence and went to the front door and knocked. Id. 
After no one answered his knock at the front door, he proceeded to the rear of the
home to knock at the back door and again received no answer. Id. at 593. As he
continued around the house intending to return to his car, the sheriff smelled
marijuana coming from an open window. Id. This information was used to obtain
a search warrant. Id. The court held that the attempt to contact the inhabitants of the
house was not a search implicating Fourth Amendment considerations. Id. at 595.

 Here, in plain view from the street, police officers saw a yellow Mitsubishi
Lancer parked in the driveway on the property. As in Long, the officers went to the
first house on the property and knocked on the front door in the hope of finding a
resident present to consent to an examination of the car. After receiving no answer
at the front door of the first house on the property, the officers saw lights on in the
second house and proceeded to approach it to locate a resident. As they walked
toward the second house, the officers noticed that the driver's side window had been
broken out. Another officer noticed a gun in the seat of a truck parked in front of the
fence surrounding the second house. At this point, the officers decided to leave the
property in order to secure a search warrant. Although Pamela Porteous testified that
a gate to the fence encompassing the rear property is typically closed and locked,
McDaniel stated that there were no "no trespassing" signs on the property. The
witnesses disputed whether the officers would have had to unlock or open a gate in
order to gain access to the second house. Additionally, the witnesses disputed
whether the officers would have had to veer off the path to the second home in order
to observe the car. Nevertheless, McDaniel testified that he saw that the driver's side
window of the yellow car was broken out and he never got closer than thirty to thirty-five feet to the car.

 Viewing the evidence in the light most favorable to the trial court's ruling, the
trial court could have reasonably concluded that the officers approached the front
door of the front house, saw lights on at the second house, and as they were lawfully
proceeding to the second house, noticed the shattered window on appellant's car. 
Accordingly, we hold that the officers did not conduct a search implicating the Fourth
Amendment or article I, section 9 of the Texas Constitution. 

 We overrule appellant's first point of error.

Self-Defense

 In his second point of error, appellant argues that because there was "testimony
that appellant was afraid that Officer Pinkerton was going to shoot him," the trial
court erred in instructing the jury that self-defense "was only an available defense if
[a]ppellant did not know that the person he was shooting at was a police officer." 
The trial court instructed the jury that it could find appellant guilty of one of four
offenses: (1) attempted capital murder of a peace officer; (2) aggravated assault of a
public servant; (3) attempted murder; or (4) aggravated assault. The trial court further
instructed the jury on the issue of self-defense for the offenses of attempted murder
and aggravated assault. However, it denied appellant's request for a self-defense
instruction for the offenses of attempted capital murder of a peace officer and
aggravated assault of a public servant. Appellant asserts that because the evidence
"raised the possibility that [a]ppellant thought the officer's use of force was
excessive," the trial court should have also instructed the jury on the issue of self-defense in regard to attempted capital murder of a peace officer and aggravated
assault of a public servant.

 A defendant is entitled to an instruction on self-defense if the issue is raised by
the evidence, whether that evidence be strong, feeble, unimpeached, or contradicted. 
Walker v. State, 994 S.W.2d 199, 201 (Tex. App.--Houston [1st Dist.] 1999, pet.
ref'd). However, the right to use self-defense against a police officer who is
attempting to effect an arrest is limited. See Tex. Pen. Code Ann. § 9.31 (Vernon
2003); Walker, 994 S.W.2d at 202. Section 9.31 of the Texas Penal Code provides
that the use of force against another is not justified "to resist an arrest or search that
the actor knows is being made by a peace officer, or by a person acting in a peace
officer's presence and at his direction, even though the arrest or search is unlawful,
unless the resistance is justified under Subsection (c)." Tex. Pen. Code Ann. §
9.31(b)(2). Specifically, subsection (c) provides that the use of force to resist an
arrest or search is justified,

(1) if, before the actor offers any resistance, the peace officer (or
person acting at his direction) uses or attempts to use greater force
than necessary to make the arrest or search; and


(2) when and to the degree the actor reasonably believes the force is
immediately necessary to protect himself against the peace
officer's (or other person's) use or attempted use of greater force
than necessary.


Id. § 9.31(c). Under this statute, a defendant must show greater force than necessary
on the part of the police officer before the justification of self-defense is applicable. 
See Walker, 994 S.W.2d at 202. Thus, to be entitled to an instruction on self-defense
when resisting an arrest or search that a defendant knows is being made by a peace
officer, there must be some evidence in the record to raise the issue of whether the
peace officer used or attempted to use greater force than necessary in attempting to
arrest or search the defendant. See id. 

 Here, Officer Pinkerton approached appellant's car in a semi-circle, so that he
came around the car from front to back and then proceeded to the front on the driver's
side. Pinkerton shouted "Houston Police" and instructed appellant to show his hands. 
After appellant did not respond, Pinkerton pulled out his firearm in the "low ready
position," also referred to as the "bladed position." As Pinkerton issued verbal
commands, appellant shot Pinkerton three times through the driver's side window of
his car. After Pinkerton fell to the ground, appellant fled the scene. Although Felicia
Gonzales testified that appellant told her that he was afraid that Pinkerton was going
to shoot him, appellant presented no evidence that Pinkerton used greater force than
necessary to arrest appellant. In fact, although Pinkerton, who was in his HPD
uniform, drew his firearm, he did not use it. See id. One may not assume that the
threatened use of force by a peace officer will become more than a threat or that the
use of such force will be greater than necessary to effect an arrest. See id. Here,
appellant, after possibly hitting Officer Pinkerton's Explorer with his car, leading
Pinkerton on a high speed chase, running two red lights, and refusing to obey
Pinkerton's commands to show his hands, has not demonstrated that Pinkerton, in
drawing his firearm, used greater force than necessary to arrest appellant.

 Accordingly, we hold that the trial court did not err in denying appellant's
request to instruct the jury on the law of self-defense in regard to the offenses of
attempted capital murder of a peace officer and aggravated assault of a public servant.

 We overrule appellant's second point of error.


Conclusion

 We affirm the judgment of the trial court.



 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


Publish. Tex. R. App. P. 47.2(b). 
1. See Tex. Pen. Code Ann. § 15.01(a) (Vernon 2003), § 19.03(a)(1) (Vernon Supp.
2006).
2. See U.S. Const. amend. IV.
3. See Tex. Const. art. I, § 9.
4. See Tex. Pen. Code Ann. § 15.01(a) (Vernon 2003), § 22.02 (Vernon Supp. 2006).