

**NUMBER 13-22-00147-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI – EDINBURG**

---

**DABRETT MONTREAL BLACK,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 87th District Court
of Freestone County, Texas.**

---

**MEMORANDUM OPINION**

**Before Chief Justice Contreras and Justices Silva and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Dabrett Montreal Black appeals his conviction for capital murder. *See* TEX. PENAL CODE ANN. § 19.03. Black argues that (1) the trial court erred by denying his requested self-defense instruction, (2) the presence of uniformed law enforcement officers at trial created a "coercive environment" in the courtroom, and (3) the court erred

by failing to exclude the testimony of several law enforcement officers because they failed to certify that they turned over all relevant evidence to the prosecution according to article 2.1397 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 2.1397(b). We affirm.[1]

## I.    BACKGROUND

At approximately 3:45 p.m. on Thanksgiving Day 2017, Texas State Trooper Damon Allen stopped Black's vehicle for driving 100 miles per hour on Interstate 45 in Freestone County. Dashcam footage from Trooper Allen's vehicle showed Black pull over, Trooper Allen approach the passenger side of Black's vehicle, and the two men engage in the following conversation:

[Allen]:    Hello. With the highway patrol. Where are you going, you're checked at a 100.

[Black]:    I'm sorry I was going for my phone, and . . .

[Allen]:    Let me get your driver's license and insurance on the car real quick. You don't have a driver's license?

[Black]:    (Inaudible)

[Allen]:    Oh, you had one, but it's suspended?

[Black]:    (Inaudible)

[Allen]:    Where you headed to right now?

[Black]:    I'm headed to my sister's house.

[Allen]:    Well, Mr. Black, definitely a speed of a hundred miles per hour is gonna be a ticket. Check your driver's license, see what it looks like, go from there, okay? Give me a minute.

---

[1] This appeal was transferred to this Court from the Tenth Court of Appeals in Waco by order of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001.

The footage showed Trooper Allen return to his vehicle to run Black's identification. Trooper Allen was notified by dispatch that there were active arrest warrants pending against Black, and he requested backup. Trooper Allen remained in his vehicle for about five minutes before Black emerged and shot at him with a rifle. Black quickly got back into his vehicle and drove away.

Trooper Matthew Poole responded to Trooper Allen's request for backup. He saw the two vehicles as he drove past on a parallel street before looping around to aid Trooper Allen. As Trooper Poole approached the scene, he saw Black's car pulling away. After he parked and exited his vehicle, he found Trooper Allen lying face-down with a mortal head wound. Trooper Poole found Black's name and license plate number on Trooper Allen's in-car computer and broadcast the information over the law enforcement radio system. Sergeant Steven Tucker from the Magnolia Police Department eventually located Black north of Houston and trailed him until Black pulled off the highway and parked on a driveway on a nearby side street. When Sergeant Tucker exited his vehicle to arrest Black, Black shot at him and fled into the nearby woods. Black was apprehended later in the night and taken to Brazos County Jail.

After a jury trial, Black was found guilty of capital murder. Because the State did not seek the death penalty, he was automatically sentenced to life imprisonment without parole. *See* TEX. PENAL CODE ANN. § 12.31(a)(2). This appeal followed.

## II.    SELF-DEFENSE INSTRUCTION

Black's first issue concerns the trial court's denial of his self-defense instruction. He argues the record included sufficient evidence to require a self-defense charge and the trial court erred in failing to include that defense for consideration by the jury. He

argues the denial of the instruction caused him harm because the jury could not consider self-defense.

## A.    Standard of Review

"We review jury charge error under a two-pronged test." *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022). First, we look to whether the charge is erroneous; then we ask whether the appellant was harmed by the error. *Id.* "Where there was a timely objection, [a]ppellant must show she suffered 'some harm.'" *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)); *see* TEX. CODE CRIM. PROC. § 36.19.

"A defendant is entitled to a jury instruction on self[-]defense if the issue [of self-defense] is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017) (citing *Elizondo v. State*, 487 S.W.3d 185, 196 (Tex. Crim. App. 2016)); *see also Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) ("The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."). "Raised by the evidence" means "there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that th[e] element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007).

A trial court's denial of a defensive issue in a jury charge is reviewed for an abuse of discretion. *Chase v. State*, 666 S.W.3d 832, 834 (Tex. App.—Tyler 2023, pet. ref'd) (first citing *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006); and then citing

*Buford v. State*, 606 S.W.3d 363, 369 (Tex. App.—Houston [1st Dist.] 2020, no pet.)). When reviewing a trial court's decision to deny a requested defensive instruction, we view the evidence in the light most favorable to the defendant's requested submission. *Id.*

**B.     Applicable Law**

The penal code provides generally that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). To justify deadly force in self-defense, the actor must first show he or she was justified in using self-defense under § 9.31. *See id.* § 9.32(a). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

However, self-defense "is not justified to resist an arrest or search that the actor knows is being made by a peace officer," whether or not the arrest or search is lawful, unless:

(1)   if, before the actor offers any resistance, the [officer] uses or attempts to use greater force than necessary to make the arrest or search; and

(2)   when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the [officer's] use or attempted use of greater force than necessary.

*Id.* § 9.31(b)(2), (c).

**C.     Analysis**

Black argues that his fear of the police compounded with his Post Traumatic Stress Disorder (PTSD) "provided sufficient evidence that it was immediately necessary" for Black to protect himself against Trooper Allen's use or attempted use of unlawful deadly

5

force. Black testified that he felt threatened by Trooper Allen and the approaching backup patrol car.[2] He argues that "the trial court denied [his] right to have the jury decide whether he reasonably believed deadly force was necessary under his perceived circumstances." The State argues that Black was not entitled to a self-defense instruction because he was resisting arrest. The State argues that Troopers Allen and Poole did not use greater force than necessary to effectuate the traffic stop or to arrest Black. Thus, Black was not entitled to a self-defense instruction because he was resisting arrest absent excessive force from the state troopers. *See id.*

We agree with the State. Black was not entitled to a self-defense instruction because he used deadly force to resist arrest and there was no excessive force from Troopers Allen or Poole. *See id.*; *Porteous v. State*, 259 S.W.3d 741, 747 (Tex. App.—Houston [1st Dist.] 2007), *pet. dism'd*, *improvidently granted*, 253 S.W.3d 288 (Tex. Crim. App. 2008) (per curiam) ("[T]he right to use self-defense against a police officer who is attempting to effect an arrest is limited." (citations omitted)).

---

[2] Black testified that after Trooper Allen went back to his vehicle, "something changed" and the sight of another trooper scared him. When asked what he thought was going to happen when the second trooper arrived, Black said:

> I don't know. It didn't seem good. I mean, at that point in time, I know [my rifle is] with me and that guy's rolling in fast and pulling up. I'm thinking like, [i]t's something else different. Like I can understand, like, yeah, if you're coming down. But the way that guy was rolling, I was looking like, [m]an, there's something ten times different and the only thing I could think about was my own safety, because I'm sitting in here with this big gun. I'm on the side of the road. I'm in the middle of nowhere, that I know of. I ain't feeling all type of fuzzy, safe or even really thinking the situation's gonna be on a practical level.

When asked why he shot Trooper Allen, Black responded:

> I felt threatened. I mean, I'm not gonna lie and say that if anything would have occurred further that I wouldn't have kept shooting. I can't say that. I know this much right here: When I initially sat back and looked at my situation in a whole, as far as where I was coming from and where I was going, it didn't look good for me to assume that it was gonna be a safe situation for me. So with that, I felt I had to do what I needed to before they did what they were gonna do.

First, Black knew he was going to be arrested. *See* Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 38.03(a) (providing that the offense of resisting arrest is committed when a person "intentionally prevents or obstructs a person he knows is a peace officer . . . from effecting an arrest . . . by using force against the peace officer"). Dashcam footage showed Trooper Allen learn of Black's suspended license and active warrants, and radio for backup. Black testified that he did not think about his arrest warrants when he was pulled over by Trooper Allen, but he knew his license was suspended and testified that after being pulled over, "it didn't look good for me." Black also admitted that he thought he was going to be arrested in a post-arrest interview with Texas Rangers Jake Burson and Josh Ray[3]:

| [Burson]: | Hey, Montreal, what—so what—what happened today with the—with the traffic stop up there? |
|---|---|
| [Black]: | I wanted to get—I wanted to go home. |
| [Burson]: | Uh-huh. |
| [Black]: | He wanted—he wanted to arrest me. I seen another car coming. That's what it was. I wanted to go home. |
| [Burson]: | You saw another car coming? |
| [Black]: | Yeah, I seen a car coming. I already know what it is. I already know what it is. I already know how it go. I'm already knowing. All they had to do—he's mad at me probably because I had a suspended driver's license. I told him about it. I was doing 100 miles an hour. . . . |

Second, the evidence showed that neither Troopers Allen or Poole used or attempted to use force, let alone "greater force than necessary," during the traffic stop. Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 9.31(c)(1). The dashcam footage from Trooper Allen's vehicle shows Trooper Allen did not threaten or make physical contact with Black. *Cf. Goddard*

---

[3] The video recording of this interview was admitted into evidence and played for the jury.

*v. State*, 154 S.W.3d 231, 232 (Tex. App.—Amarillo 2005, no pet.) ("[T]he mere act of grabbing a suspect's arm or arms has been held not to constitute excessive force." (citations omitted)); *see also Dubose v. State*, No. 13-12-00515-CR, 2014 WL 1788906, at *7 (Tex. App.—Corpus Christi–Edinburg May 1, 2014, no pet.) (mem. op., not designated for publication). Likewise, dashcam footage played at trial showed that Trooper Poole never made physical contact with Black. Black also admitted that Trooper Poole did not use any force on him.[4] *See Porteous*, 259 S.W.3d at 748 ("One may not assume that the threatened use of force by a peace officer will become more than a threat or that the use of such force will be greater than necessary to effect an arrest." (citing *Walker v. State*, 994 S.W.2d 199, 202 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd))). Lastly, we agree with the State that "driving a patrol car at a high rate of speed" does not constitute the use of "force" under these circumstances.[5]

The record supports the finding that Black was resisting arrest when he fatally shot Trooper Allen, and that Troopers Allen and Poole did not use excessive force against

---

[4] That testimony was as follows:

| [The State]: | Okay. And you said that you felt threatened by the second trooper coming up fast and that's why you did what you did? |
|---|---|
| [Black]: | I mean, yeah. |
| [The State]: | Okay. That trooper also did not use any force on you, did he? |
| [Black]: | Yeah, but it ain't what I'm thinking. |
| [The State]: | Well, let me ask you again. That trooper did not use any force on you. |
| [Black]: | Yeah. I didn't give him a chance to. No[.] |

[5] We note that if the actor did not know the person effectuating arrest was a law enforcement officer, then this exception may not apply. *See* TEX. PENAL CODE ANN. § 9.31(b)(2). Because Black clearly knew the troopers were law enforcement, we need not analyze this element of the statute.

Black. Accordingly, we hold that the trial court did not abuse its discretion when it denied his self-defense instruction. *See Chase*, 666 S.W.3d at 834.

We overrule Black's first issue.

### III.    UNIFORMED OFFICERS IN THE COURTROOM

By his second issue, Black argues that the presence of uniformed officers at trial created a coercive courtroom atmosphere and constituted an inherent prejudice that entitles him to a new trial.

**A.    Standard of Review & Applicable Law**

"A defendant has a constitutional right 'to be tried by impartial, indifferent jurors whose verdict must be based upon the evidence developed at trial.'" *Parker v. State*, 462 S.W.3d 559, 567 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (quoting *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996)). "When a defendant claims reversible error based on external juror influence, as here, the defendant must show either actual or inherent prejudice." *Id.* Black does not argue there was actual prejudice. As such, when analyzing inherent prejudice, "we look to whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.* (quoting *Howard*, 941 S.W.2d at 117). "Essentially, the test is whether there is a 'reasonable probability that the conduct or expression interfered with the jury's verdict.'" *Id.* (quoting *Howard*, 941 S.W.2d at 117).

**B.    Analysis**

Prior to trial, Black filed a "Motion to Prevent Law Enforcement From Wearing Uniforms in the Courtroom and/or in the Presence of Any Juror or Potential Juror." The trial court denied the motion but stated, "I'm going to make it clear to all the officers: I do not want any insignias or placards about Damon Allen on the uniform; but if it's your

9

standard uniform, you certainly have a right to wear it." At trial, Black's counsel made multiple remarks for the record to note the number of uniformed officers as spectators in the courtroom, including:

> [W]e would like the record to show that there are five troopers in the courtroom in uniform. At this time, there may be others that come in, just so the record may—so we maintain that record.

> Judge, I'd like the record to reflect that there are at least five troopers in the room. There's uniformed troopers; there's several non-uniformed and at least one other officer with a badge. I will note they're not wearing any placards, but we'd renew our objection[.]

> [I]'d ask the record to reflect that there are five uniformed troopers in the room, not including any non-uniformed troopers[.]

Black does not argue that the uniformed officers ever held up signs or insignias in support of Trooper Allen. Nor does he argue that they engaged in any kind of "overt conduct or expression" to influence the jury or "that the law-enforcement contingency gravitated toward the jury." *See Howard*, 941 S.W.2d at 118. Instead, Black argues that the sheer number of uniformed officers in the courtroom was prejudicial enough to warrant a new trial. *See id.* at 117–18.

The mere presence of some uniformed officer spectators during a trial involving an offense against a fellow officer is not inherently prejudicial. *See Compton v. State*, 666 S.W.3d 685, 724–26 (Tex. Crim. App. 2023); *Howard*, 941 S.W.2d at 118. In *Howard*, the Texas Court of Criminal Appeals held that there was no inherent prejudice when twenty police officers wore their uniforms during the punishment phase of trial of a defendant who killed a police officer. 941 S.W.2d at 117–18. The court explained that the uniformed officers' presence was not inherently prejudicial because they were "sitting near the back of the courtroom" and were "mingled with 80 other spectators." *Id.* at 117. The court noted

10

that there "might be some basis for appellant's argument" if the record had indicated "some overt conduct or expression, or perhaps a higher ratio of police officers, or even perhaps some indication that the law-enforcement contingency gravitated toward the jury." *Id.* at 118.

Similarly, the high court held in *Compton v. State* that the presence of twelve to eighteen Texas Department of Criminal Justice (TDCJ) employees or correctional officers, who "comprised somewhere between thirteen and nineteen percent of the spectator gallery," did not establish a reasonable probability of improper interference with the jury's verdict because they "did not impede the trial proceedings, sat quietly in the back half of the courtroom, [and] did not gesture or 'gravitate' towards the jurors." *Compton*, 666 S.W.3d at 725–26 (quoting *Howard*, 941 S.W.2d at 118).

This case is like *Howard* and *Compton*. The evidence indicates the number of uniformed officers in the courtroom was not excessive in absolute or relative terms. When Black noted the number of uniformed officers in the courtroom, the trial court responded either that there were "three or four times that many people just dressed in suits" or it counted twenty-two to twenty-nine spectators who were not officers. From the record, no more than about twenty-five percent of the spectators in the courtroom were uniformed officers. Furthermore, like *Howard* and *Compton*, the record does not reflect that the officers in the courtroom engaged in specific conduct or expression that influenced the jury. *See Compton*, 666 S.W.3d at 726; *Howard*, 941 S.W.2d at 117–18; *see also Parker*, 462 S.W.3d at 568 ("[T]he record indicates that there were sixty to seventy spectators wearing purple, but there is no indication that there was overt conduct by the spectators or that they gravitated toward the jury. The record also does not establish the ratio of

11

spectators with purple dress to those not wearing purple. Thus, even more so than in *Howard*, the record is too sparse to conclude that appellant suffered inherent prejudice based on spectators' wearing the color purple." (emphasis omitted)). Accordingly, we conclude that the record does not demonstrate a reasonable probability that the presence of uniformed officers interfered with the jury's verdict. *See Parker*, 462 S.W.3d at 567.

Appellant's second issue is overruled.

## IV. ARTICLE 2.1397 CERTIFICATIONS

In Black's third and final issue, he argues that the testimony of five state law enforcement officers should have been excluded because they did not submit written statements to the State as required by Texas Code of Criminal Procedure article 2.1397(b). *See* TEX. CODE CRIM. PROC. ANN. art. 2.1397(b). Black argues that the officers could have hidden exculpatory and mitigating evidence from the defense because they failed to provide these certifications to the State. Black maintains that the trial court erred in denying his pretrial motion on the matter and his subsequent objections to the admission of the officers' testimony.

### A. Standard of Review & Applicable Law

A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *Matew v. State*, 655 S.W.3d 291, 300 (Tex. App.—Corpus Christi–Edinburg 2022, pet. ref'd) (citing *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)). However, as here, where the trial court is interpreting a statute, we review a trial court's conclusions of law de novo. *Alford v. State*, 400 S.W.3d 924, 929 (Tex. Crim. App. 2013) (citing *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)).

12

"In construing statutes, 'we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment.'" *Whitfield v. State*, 430 S.W.3d 405, 408 (Tex. Crim. App. 2014) (quoting *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). "This strict reading of the statutory language is necessary because the text of the statute *is the law* in the sense that it is the only thing actually adopted by the legislators, probably through compromise, and submitted to the Governor." *Id.* (internal quotations omitted) (emphasis in original). "If the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then and only then, out of absolute necessity, is it constitutionally permissible for a court to consider . . . such extra textual factors as executive or administrative interpretations of the statute or legislative history." *Id.* (internal quotations omitted) (emphases omitted). However, "'[w]hen the statute is silent as to the consequences for noncompliance, we look to the statute's purpose in determining the proper remedy.'" *City of DeSoto v. White*, 288 S.W.3d 389, 398 (Tex. 2009) (quoting *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001)).

The Texas Legislature passed Senate Bill 111 in 2021 and codified it as Texas Code of Criminal Procedure article 2.1397. Act of May 29, 2021, 87th Leg., R.S., ch. 509 (S.B. 111), § 1, eff. Sept. 1, 2021, *codified as* TEX. CODE CRIM. PROC. ANN. art. 2.1397. The law states in pertinent part:

> (b)     A law enforcement agency filing a case with the attorney representing the state shall submit to the attorney representing the state a written statement by an agency employee with knowledge of the case acknowledging that all documents, items, and information in the possession of the agency that are required to be disclosed to the defendant in the case under Article 39.14 have been disclosed to the attorney representing the state.

(c)     If at any time after the case is filed with the attorney representing the state the law enforcement agency discovers or acquires any additional document, item, or information required to be disclosed to the defendant under Article 39.14, an agency employee shall promptly disclose the document, item, or information to the attorney representing the state.

TEX. CODE CRIM. PROC. ANN. art. 2.1397(b), (c).[6]

## B.     Analysis

Black argues that he may use article 2.1367 as a mechanism to object to the admissibility of the officers' testimony because "the proper focus of the statute is to provide a criminal defendant a fair trial with all constitutionally required evidence produced in advance." Though the statute does not explicitly give the defense this authority, Black analogizes his right to enforce article 2.1397 with that of a third-party beneficiary to a contract. Black argues the statute was intended to secure a benefit to the accused, i.e., to avoid a conviction due to missing exculpatory evidence. However, Black does not argue that the State actually withheld mitigating or exculpatory evidence, but rather that the testifying officers *may* be in possession of exculpatory evidence in light of their failure to provide written statements under article 2.1397.[7]

The statute's plain text does not state whether it can be used by a defendant to exclude testimony by officers who do not comply with the statute. *See* TEX. CODE CRIM.

---

[6] We note that this article will be repealed effective January 1, 2025. Act of May 19, 2023, 88th Leg., ch. 765 (H.B. 4504), § 3.001(1), eff. Jan. 1, 2025.

[7] We assume without deciding that article 2.1397 applies retroactively to this case. The offense occurred in 2017, yet the bill's effective date was September 1, 2021. *See Jordan v. State*, 54 S.W.3d 783, 787 (Tex. Crim. App. 2001) ("Whether a new rule of nonconstitutional origin that benefits the accused should be applied retroactively is evaluated under the balancing test set out in *Stovall v. Denno*, [388 U.S. 293] (1967), in which the following factors are balanced: (a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.").

PROC. ANN. art. 2.1397. The law does not provide an enforcement mechanism, nor does it describe what happens to a law enforcement agency or an agency employee who fails to submit the written statement to the State's attorney. *See id.* Typically, when a statute is silent on its face as to the consequences of noncompliance, we look to the statute's purpose in determining the proper remedy. *See White*, 288 S.W.3d at 398. According to the bill analysis of the statute, the purpose of the law was to address concerns "that some prosecuting attorneys do not always receive all relevant evidence on a particular case from law enforcement agencies, leaving the attorney vulnerable to *Brady* violations." *See* House Comm. on Crim. Juris., Bill Analysis, Tex. S.B. 111, 87th Leg., R.S. (2021); *see also* Senate Comm. on Crim. Just., Bill Analysis, Tex. S.B. 111, 87th Leg. R.S. (2021). Thus, the legislative history also does not indicate whether a defendant may use the statute to exclude relevant testimony from officers who fail to comply with the statute.

However, even if the legislature intended for a defendant to be able to object to an officer's testimony under article 2.1397, there is no indication that the defendant could do so successfully without pointing to evidence that the officer has actually withheld exculpatory information. Stated another way, we do not believe the legislature intended to allow a defendant to use article 2.1397 to suppress evidence or obtain a new trial in lieu of proving a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963); *cf. Boykin*, 818 S.W.2d at 785 ("[W]here application of a statute's plain language would lead to absurd consequences that the Legislature could not possibly have intended, we should not apply the language literally." (emphasis omitted)). Under *Brady*, the State is required to disclose evidence known to it that is favorable or material to a defendant's guilt or punishment, whether or not the defendant requests it. *See, e.g.*, *Fears v. State*, 479

15

S.W.3d 315, 327 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd). But to establish a *Brady* violation, a defendant must show: "(1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material." *Id.* (first citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); and then citing *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006)). To accept Black's argument would mean that the defense could suppress relevant testimony without showing that the State withheld relevant evidence at all.[8]

In sum, we find no indication from the language of article 2.1397 that it was intended to be used by a defendant to exclude testimony by officers who do not comply with the statute. Even if article 2.1397 could be used this way, Black has not pointed to any part of the record demonstrating that the testifying officers withheld exculpatory or mitigating evidence.

Black's third issue is overruled.

## V.   CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
2nd day of November, 2023.

---

[8] We note that the Texas legislature overhauled the discovery rules in 2014 in response to concerns that exculpatory or mitigating information was being withheld from criminal defendants during discovery. *See generally Watkins v. State*, 619 S.W.3d 265, 274–78 (Tex. Crim. App. 2021) (stating that the new discovery rules under article 39.14 "broaden criminal discovery for defendants, mak[e] disclosure the rule and non-disclosure the exception," and create "a free-standing duty" on the State to disclose all exculpatory evidence to the defense). "According to the plain text of [a]rticle 39.14, criminal defendants now have a general statutory right to discovery in Texas beyond the guarantees of due process." *Id.* at 291.