

# NUMBER 13-22-00207-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JONATHAN MICHAEL CADENA
A/K/A JONATHAN CADENA,                                    Appellant,

v.

THE STATE OF TEXAS,                                      Appellee.

On appeal from the 156th District Court
of Live Oak County, Texas.

# MEMORANDUM OPINION

Before Justices Tijerina, Silva, and Peña
Memorandum Opinion by Justice Silva

Appellant Jonathan Michael Cadena a/k/a Jonathan Cadena was convicted for aggravated assault with a deadly weapon against a public servant, taking a weapon from a peace officer, and felon in possession of a firearm. *See* TEX. PENAL CODE ANN. §§ 12.42,

22.02(b)(2)(B), 38.14, 46.04, 12.42. With enhancements,[1] appellant was sentenced to sixty, sixty, and twenty-five years of imprisonment with the sentences to run concurrently. By two issues, appellant contends: (1) the trial court abused its discretion by excluding expert testimony regarding the use of force by a taser; and (2) the trial court abused its discretion by denying appellant's "right to present a defense under the Sixth and Fourteenth Amendments to the Constitution of the United States by excluding . . . evidence raising excessive force and self-defense." We affirm.

## I. BACKGROUND

Officer Carlos Castillejos testified that on August 18, 2020, he was on duty when dispatch advised him that "a driver . . . had jumped out of a moving vehicle on the side of the highway and the vehicle had driven into the ditch." At the time, Officer Castillejos was wearing his city-issued police uniform and a body camera and was driving a Ford Explorer with designations for George West Police Department (GWPD). Officer Castillejos arrived at the scene on U.S. Highway 281 and spoke with a witness who informed him that a male individual with a t-shirt wrapped around his head, wearing a black shirt and shorts, was walking down the highway near the vehicle. Officer Castillejos discovered that the vehicle, a black Mitsubishi, was still running. He observed that the faceplate of the radio was missing, and wires were extruding from the bottom of the console, which indicated to him that there was a possibility that the vehicle had been stolen. Officer Castillejos called in the license plate for the vehicle and confirmed that the vehicle had been stolen.

---

[1] During the punishment phase of trial, appellant pleaded true to enhancements for the felony offenses of aggravated sexual assault of a child and criminal mischief.

2

Officer Castillejos returned to his patrol unit and drove down the highway where the witness indicated that the male individual was walking. He saw appellant, dressed as the witness had described, walking along the highway on a grassy verge in front of a storage facility. Officer Castillejos activated his siren and lights, stopped his patrol unit, and exited his patrol unit with his firearm in his right hand and his taser in his left hand. At this point, Officer Castillejos testified that he was executing a felony stop because the vehicle had been stolen. He repeatedly instructed appellant to drop and lay flat on the ground and that he would tase him if he failed to comply, but appellant failed to do so. Appellant eventually held his hands up and put one knee on the ground but failed to lay flat, and Officer Castillejos tased him.

During these events, off-duty border patrol agent Gerardo Gonzalez Jr., a licensed peace officer, drove past the incident, saw that Officer Castillejos was alone and armed with his taser, and approached to determine if Officer Castillejos required assistance. Agent Gonzalez parked his vehicle behind Officer Castillejos's patrol unit and approached, verbally identifying himself as a law enforcement officer and holding out his identification. Agent Gonzalez approached appellant and attempted to handcuff him, but appellant resisted. Agent Gonzalez told appellant to "stay on the ground," but he did not comply, then "he got up," "pulled away," and appellant, Agent Gonzalez, and Officer Castillejos "went to the ground" and "started wrestling." During the struggle, Officer Castillejos exclaimed that appellant was trying to seize his firearm, and then subsequently exclaimed that appellant had gained possession of the firearm. Agent Gonzalez recovered the firearm, emptied the magazine, and shot the round that was in the chamber.

3

Officer Castillejos suffered a blow to the face during the struggle.

Trooper Raul Garcia Jr., with the Texas Department of Public Safety, arrived at the scene, saw Officer Castillejos and two individuals struggling, and reported a "10-10," or a fight in progress. Trooper Garcia initially assumed that two individuals were beating up a police officer, so he approached the trio with his weapon drawn. Agent Gonzalez informed him that he was an off-duty border patrol agent, and Trooper Garcia instructed Agent Gonzalez to throw the gun away from the scene and place appellant in handcuffs. Trooper Garcia testified that appellant was still resisting arrest and "trying to get away." At this point, additional officers arrived on scene and assisted in securing appellant.

Based on this sequence of events, appellant was indicted for aggravated assault with a deadly weapon against a public servant, taking a weapon from a peace officer, and felon in possession of a firearm. *See* TEX. PENAL CODE ANN. §§ 22.02(b)(2)(B), 38.14, 46.04. At trial, the jury heard testimony from Officer Castillejos, Agent Gonzalez, Trooper Garcia, and appellant's expert witness, Michael Raymond Sanchez. Additionally, the jury saw and heard videos of the incident secured from the body cameras worn by Officer Castillejos and Trooper Garcia, reviewed a still photograph captured from one of the videos that depicted a tattooed hand holding a firearm, and reviewed portions of the GWPD policy manual. The jury convicted appellant on all three counts and assessed punishment of sixty years of confinement on two counts and twenty-five years on the remaining count. This appeal followed.

## II. EXPERT TESTIMONY

We review the trial court's determination regarding the admissibility of expert

4

testimony for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). Under this standard, we "must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). "Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). Thus, "[a] trial court's ruling on the admissibility of expert testimony will rarely be disturbed on appeal." *Buford v. State*, 606 S.W.3d 363, 372 (Tex. App.—Houston [1st Dist.] 2020, no pet.). Whether expert testimony will help the jury understand the evidence or determine a disputed fact and, thus, whether the expert's testimony is admissible are threshold determinations to be made by the trial court. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Rodgers*, 205 S.W.3d at 527; *Ruiz v. State*, 631 S.W.3d 841, 856 (Tex. App.—Eastland 2021, pet. ref'd).

Texas Rule of Evidence 702 governs the admissibility of expert testimony and states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702. Thus, expert testimony is admissible if: (1) the witness is qualified as an expert by reason of knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will assist the trier of fact to decide the case. *Rhomer*, 569 S.W.3d at 669.

5

To determine whether a trial court has abused its discretion in ruling on an expert's qualifications, we consider three factors: (1) the complexity of the field of expertise; (2) the conclusiveness of the expert's opinion; and (3) the centrality of the area of expertise to the resolution of the lawsuit. *Id.* at 669–70; *Rodgers*, 205 S.W.3d at 528. "Greater qualifications are required for more complex fields of expertise and for more conclusive and dispositive opinions." *Rhomer*, 569 S.W.3d at 670. In soft sciences and fields based primarily upon experience and training, an expert's opinion will be reliable if: (1) the field of expertise is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Allison*, 666 S.W.3d at 759; *see Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999) (en banc) (disapproving of *Nenno*'s holding that Texas Code of Criminal Procedure article 38.22 applies only to custodial statements).

## III.    ANALYSIS

Appellant contends that the trial court abused its discretion by excluding expert testimony regarding the use of force by use of a taser and by denying appellant the right to present a defense under the Sixth and Fourteenth Amendments to the Constitution of the United States by excluding evidence regarding excessive force and self-defense. *See* U.S. CONST. amends. VI, XIV. Appellant summarizes his argument as follows:

> The defense proffered the testimony of a well-qualified expert on the use of force and excessive force, including the use of tasers. While the expert had not taught the use of tasers to police officers, he was certified in their use and he met all requirements for the admission of this testimony. The trial court's exclusion of any testimony regarding use of force of any kind, including tasers was not only an abuse of discretion, but nullified

6

[a]ppellant's constitutional right to present a defense.

Appellant asserts that the trial court's actions left "the jury in the dark about the significance of [Officer] Castillejos's use of force." Appellant also contends that:

> The facts of this case, displayed with sparkling clarity by way of on-scene video, raised self-defense and excessive force as issues for a jury, but only if the defense, through its expert witness Sanchez, could have put those issues before the jurors. The trial court precluded these issues, leaving the jury in the dark about the significance of [Officer] Castillejos'[s] use of force. The trial court's exclusion of Sanchez'[s] testimony was not only an abuse of discretion, but constituted an evisceration of [a]ppellant's constitutional right to present a defense.

The State argues, in contrast, that nothing in Sanchez's proposed testimony related to a fact in issue as set forth in the indictment, appellant has not explained how any issues regarding self-defense would apply to the offenses of felon in possession of a firearm or aggravated assault, appellant was not deprived of any defense to the charges against him because the jury was expressly given an excessive force instruction, and the State did not carry a burden of demonstrating the legality of Officer Castillejos's encounter with appellant.

## A.     Self-Defense and Excessive Force

The right to resort to self-defense is limited in the context of resisting a search or an arrest, which includes being placed under restraint or taken into custody. *Steele v. State*, 490 S.W.3d 117, 131–32 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Under the penal code, the use of force to resist an arrest or search is justified:

> (1) if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and

> (2) when and to the degree the actor reasonably believes the force is

7

immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.

TEX. PEN. CODE ANN. § 9.31(c); *see Porteous v. State*, 259 S.W.3d 741, 748 (Tex. App.—Houston [1st Dist.] 2007, pet. granted), *pet. dism'd improvidently granted*, 253 S.W.3d 288 (Tex. Crim. App. 2008).[2]

Here, the jury was expressly instructed that: "It is a defense to prosecution for the offense of Taking a Weapon from a Peace Officer if the evidence shows that the Defendant took or attempted to take the weapon from a peace officer who was using force against the Defendant or another in excess of the amount of force permitted by law."

**B.      Preliminary Hearing on Expert Testimony**

Prior to trial and outside the presence of the jury, appellant presented Sanchez's qualifications and testimony. Sanchez has a bachelor's degree in police science, a master's degree in criminal justice administration, and a PhD in business administration with a specialization in criminal justice. Sanchez explained that he wrote his dissertation on "the acculturation of police officers, in other words, dealing with people from highly diverse cultures." He has also written six chapters in five different books on international police and peacekeeping. Sanchez acknowledged that he had not published any materials on the use of force or police policies.

Sanchez teaches criminal justice for the University of Texas, Rio Grande Valley, online classes for Utica College, and in-service classes for Texas Southmost College

---

[2] Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct. *See Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). The confession-and-avoidance doctrine does not require an explicit admission from the defendant that he committed the offense; however, the defensive evidence must allow the arbiter of facts to reasonably infer the elements of the offense. *See Maciel v. State*, 631 S.W.3d 720, 725 (Tex. Crim. App. 2021).

Police Academy on an "as needed" basis. He currently serves as an active peace officer and is a lieutenant for the constable's office of Cameron County, Precinct 2, as a reserve officer. He assists the constable's office with developing policies, training, administration, and internal affairs investigations.

Sanchez testified that he has over twenty-five years of experience in the criminal justice system and that he has worked as a jailer, patrol officer, sergeant, administrative sergeant, investigator, lieutenant, special investigator, and interim chief of police. Sanchez has further worked as an international police officer for the United Nations, serving variously as an investigator on a counter-terrorism task force, police instructor and firearms instructor, deputy chief of training, and director of personnel and administration. He testified that he has specialized training as an instructor in the use of firearms, batons, tasers, pepper sprays, defensive tactics, specialty impact munitions, and crisis negotiation, and further testified that he was "basically an instructor in all aspects of use of force."

Sanchez testified that he routinely investigates matters in which an officer has potentially used excessive force. He has "also been looking at these sorts of incidents as an instructor for the last [twenty] years, evaluating police incidents to try to find improvements in approaches and techniques and tactics." He testified that, "you can't assess or teach use of force mathematically" because it is "based on the totality of the circumstances, everything that is happening at the time[,] and everything the officer knew at the time."

Sanchez told the trial court that he has consulted as an expert and has qualified

9

as an expert on cases involving various factual scenarios regarding a police officer's use of force; however, Sanchez did not indicate that any of these cases involved the deployment of a taser. Sanchez further explained that the present case was the first case in which he was presenting expert testimony in court.

Sanchez testified that he had reviewed the documentation, discovery, and videos pertaining to this case and had performed his own independent investigation. Sanchez had developed an opinion about how appellant's detention and arrest was handled and whether commonly accepted best practices were used in this case, and he stated that he was prepared to render an opinion on "the totality of the officer's actions and the use of force." This analysis encompassed the officer's approach, justifications, probable cause, process of seizing, contemporaneous knowledge, reasonable suspicion, and best practices.

On cross examination, Sanchez explained that he was certified as a taser instructor by Axon, a company that manufactures the "lion['s] share" of tasers. Sanchez clarified that he received that certification within the past year and that he has not provided training on taser use since receiving that certification. Sanchez testified that he has fired a taser, and he has been tased, but he has never actually deployed a taser on a subject. Sanchez explained that he is currently working on developing a policy for the use of tasers for the constable's precinct but acknowledged that the precinct did not possess any tasers. Sanchez testified that he has not conducted demonstrations or tests on the use of tasers, that he has no publications on their use, and that he has no scientific or medical training regarding tasers. The totality of his knowledge regarding tasers and interpreting

the graphs or data from them is derived from his training as a taser instructor. The taser training that Sanchez received included the interpretation of taser logs which show when the taser was used, when it was deployed, when it was fired, "and if it made the correct circuit, meaning if the probes were actually delivering the charge." He stated that he did not need to know how effective the charge was or the failure rate of the charge. Sanchez stated that he was unaware of any peer reviewed studies that analyzed such data regarding actual taser deployments. He was not aware of any possible error rate, flaws, or methodology problems.

Sanchez explained that his testimony would focus on the use and deployment of the taser, rather than any scientific ramifications, and he would address when, why, and how an officer should use a taser. Sanchez stated that he would also testify about the use of force generally. Sanchez explained that he has conducted countless training sessions regarding the use of force because the use of force "[is] interwoven through all of police operations." He testified that there is "nothing unique about when you should employ the taser" as opposed to other secondary less lethal weapons, such as pepper spray.

Based on the foregoing, appellant's counsel offered Sanchez as an expert witness. The State objected as follows:

> The State would object to . . . the use of Dr. Sanchez as an expert. I'm still a little bit confused exactly what topics are going—he is going to be employed as an expert in. It sounds like use of force was one of them. I'm not sure that—he has never testified as an expert in use of force in Texas before. I understand that he has many years of experience in that area, but I don't see how that would necessarily separate him from, say, any other officer who has training and experience that we would not necessarily consider an expert.

11

As to his—as an expert with regard to tasers, we would object as well as—although he is, I guess, certified as a taser instructor, he has never provided training in the use of tasers, has never actually deployed a taser or had to deploy it on someone, and I don't think that overall[,] any of the factors under [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) or *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992)] have been satisfied here.

There has been no theory presented that can be peer reviewed or scientifically tested. We have no knowledge of any kind of error rate or general acceptance of any theory as it relates to use of force or tasers.

After additional colloquy regarding Sanchez's qualifications and proposed testimony, the trial court made the following ruling:

I'm going to find that the threshold, the standard, has not been met. The witness will not testify as an expert.

You may have the witness testify regarding training, but he will not testify regarding an evaluation of any of the materials that he has related or rendered an expert opinion on [regarding] the activity of other officers. He can talk about training generally since he does training and has some expertise in that.

But you have not demonstrated that he has any expertise or been qualified as an expert in the areas of either the handling or deployment of tasers or similar equipment or that he should be accepted as an expert in the area of appropriate police response or the other [topics] offered.

## C.    Trial Testimony and Evidence

Officer Castillejos served as the first witness at trial. He testified that he graduated from the police academy in 2010 and had worked for GWPD as a patrol officer for three years. He testified that the theft of a vehicle constitutes an unauthorized use of a motor vehicle, which is a felony. Officer Castillejos found appellant walking down the freeway approximately a quarter of a mile away, and there were no other pedestrians in the area. Officer Castillejos suspected that appellant was the individual who had been driving the

12

Mitsubishi because he was "the only individual that was walking alongside the road at that time." According to Officer Castillejos, "[t]he distance seemed appropriate as well as the description, the physical description, the shorts, the color of shirt and the main indicator I took to be the shirt over his face."

Officer Castillejos testified that the appropriate approach to individuals by a police officer varies depending on what the officer perceives as "the threat level," and he was investigating a felony offense, so he performed what is called a "felony stop" or a "high-risk stop." He explained that in a felony or high-risk stop, an officer takes cover at his or her vehicle, draws a firearm, and gains compliance from the subject before proceeding. This procedure contrasts with a typical stop in which an officer walks to the subject to make contact. The distinction in the two procedures is made for the purposes of officer safety.

Officer Castillejos testified that when he located appellant walking down the highway, he stopped his patrol unit, took cover behind his door, and held his firearm in his right hand and a taser in his left hand before contacting appellant. He acknowledged that having a gun in his right hand and a taser in his left hand was not a "best practice" because of the potential for a "sympathetic trigger squeeze." Officer Castillejos stated that he planned to place appellant in handcuffs for an investigative detention regarding the stolen vehicle, and he told appellant to lay down on the ground because that "is the safest positioning for an individual to be in . . . for me to get control of the situation and the individual if I'm going to place him in handcuffs." Officer Castillejos explained that he wanted appellant to "lie completely on the ground" to prevent him from running away,

13

running towards him, or running into the highway traffic given their "dangerous" proximity to the highway. Officer Castillejos further explained that he was concerned that appellant might be armed because he had left a stolen vehicle, and appellant "bladed his stance" while not looking directly at him which is "something that people normally use to conceal if they are carrying a weapon."

Officer Castillejos testified that he repeatedly instructed appellant to lay down; however, appellant did not comply and was instead positioned on one knee with his hands in the air. Officer Castillejos observed nothing in the area, such as broken glass, which would have prevented appellant from laying on the ground. After reviewing the body camera recording of the incident, Officer Castillejos testified that the video indicated that he instructed appellant to lay down eighteen different times. The video further indicated that appellant asked him, "Am I going to die right now?" He responded, "No." Appellant failed to lay down, so Officer Castillejos ultimately deployed his taser. Officer Castillejos testified he had been trained in the use of tasers and had deployed them in training, but this was his first time to deploy a taser.

After tasering appellant, Officer Castillejos attempted to put his firearm back into his holster but pulled his firearm back out when he "observed [appellant's] hands reach towards his waistline area" because he "believed that it was a possibility at that point in time he might be reaching for a weapon." Further, when the taser made contact, appellant stiffened up, then pulled his arms towards his body, and "it appeared he was trying to disconnect . . . the taser probes from his body." Officer Castillejos informed dispatch that he had deployed the taser, and he believed that he deployed the taser an additional four

14

or five times while continuing to issue commands to appellant without gaining compliance.

During this period, Agent Gonzalez arrived, displayed his badge, and verbally identified himself as an off-duty border patrol agent. He attempted to handcuff appellant after pulling him to a standing position, but appellant was actively resisting arrest and was "wrestling" with Agent Gonzalez and Officer Castillejos. The three fell to the ground, and Officer Castillejos testified that appellant was "going for [his] gun," and that he "felt upward tugging on [his] hip on [his] side in the area where [his] gun is located." Officer Castillejos explained that, at this point in time, his firearm was secured by passive retention, or friction, and a switch which has to be pulled back in order to release the firearm, but he had not engaged the "strap" covering the firearm after displaying the firearm earlier in the stop. The firearm ultimately came out of Officer Castillejos's holster. Officer Castillejos testified that the firearm "had to have been purposely removed" and that it could not have fallen out or been removed by "a simple tug." He further testified that he visually saw appellant with the firearm, "both with sole and exclusive possession of the firearm, and then all three of us were also grabbing it at some point in time." Officer Castillejos testified that appellant's possession of the firearm was not accidental, and he "saw [appellant] grip firmly on [his] firearm." Officer Castillejos identified a still frame taken from the video as displaying appellant's hand as the "heavily-tattooed hand holding my service weapon." Officer Castillejos testified that he feared for his life during the struggle and described appellant's conduct as intentional, deadly, and combative. He specifically described the struggle as "a fight for my life." Officer Castillejos testified that appellant "headbutted" him twice during the struggle, causing pain to his mouth and cheek, and causing the inside of

15

his mouth to bleed, and the jury examined photographs of this injury.

At this point in the testimony, appellant's counsel made an offer of proof outside the presence of the jury regarding Sanchez's proposed testimony. Sanchez opined that Officer Castillejos used excessive force because he had no probable cause to believe that appellant was the driver of the stolen vehicle. According to Sanchez, Officer Castillejos did not have probable cause to detain appellant but instead "pointed his gun at him without any explanation." Sanchez testified that this action was contrary to the best practices, policies, and procedures employed by police officers. Sanchez testified that appellant's lack of cooperation was likely caused by being in "crisis mode" due to the firearm. Sanchez testified that according to taser training and policy, tasers are not to be deployed merely because an individual is not following verbal commands, and they are instead to be used if the subject is using force on the officer or is attempting to flee, and neither situation occurred here.

Further, Sanchez testified that Officer Castillejos had failed to properly holster his weapon. Although Officer Castillejos testified that he engaged a secondary retention device by latching his weapon into his holster, Sanchez opined that Officer Castillejos failed to do so because the video of the recording failed to capture the "clicking" sound that would have occurred when the secondary retention device engaged. Sanchez testified that officers commonly fail to properly secure their weapons to shorten their response time. Sanchez thus testified he believed that the gun fell out of the holster during the struggle because it was not secured. Sanchez explained that according to his analysis of the video, appellant did not attempt to charge at Officer Castillejos but was rather

16

propelled forward by Agent Gonzalez who was attempting to cuff him. Ultimately, Sanchez testified that Officer Castillejos used excessive force and that he failed to follow proper police procedures.

After hearing the foregoing, the trial court allowed Sanchez to testify but limited the scope of his testimony:

> [Sanchez] has testified that he is qualified as a trainer for taser, although he has never trained anybody in the use or operation of a taser or similar-like device. He can testify about training in the use and operation of a taser. He trains officers in the use of force. He can testify about training officers in the use of force based on his experience and his work as a trainer of officers either in the academy someplace or as continuing law enforcement officer TCLEOSE [Texas Commission on Law Enforcement Officer Standards and Education] training. He can't give any opinion—he is not qualified under his testimony, in my opinion, to give an opinion regarding the use of force in this case or the use of a taser in this case.

The trial court subsequently clarified that Sanchez could testify regarding how he trains officers, but "he doesn't demonstrate any expertise in evaluating or opining on use of force by anybody else."

After the trial court's ruling, appellant's counsel cross-examined Officer Castillejos. Officer Castillejos confirmed that the witness he initially interviewed did not see the Mitsubishi leave the highway and go into the ditch and did not see appellant exit the car; thus, the extent of Officer Castillejos's knowledge at the inception of the incident was merely that there was a man walking away from the vehicle. Officer Castillejos explained that making reasonable deductions is part of his job, and he thought that it was reasonable to assume that appellant was associated with the stolen vehicle given the time that had elapsed since the dispatch, the distance between appellant and the vehicle, and the fact that appellant was wearing the same clothing that the witness had described. Further,

17

there were no other pedestrians, and it was not a residential area.

Officer Castillejos acknowledged that in the past he had violated GWPD's "Policy and Procedures" manual "a couple of times to [his] knowledge," and he had been reprimanded for lack of performance duties, disobedience of or failure to comply with departmental orders, and insubordination. However, Officer Castillejos denied violating any policies and procedures on the date of this incident. In this regard, appellant's counsel extensively cross-examined Officer Castillejos regarding his use of a taser during the encounter. The policy manual provides that an officer is authorized to use a taser, denominated in the manual as a "conducted energy device" or a CED, as follows:

1. The CED may be utilized in situations when necessary to subdue a noncompliant subject when lesser means of control have not been successful and the suspect is physically resisting officers.

2. The act of verbal non-compliance shall not justify the use of the CED weapon.

3. The CED may be utilized to debilitate a subject who poses an immediate threat of serious bodily injury or death to himself/herself, the officer, or others.

Through cross-examination, appellant's counsel suggested that none of these three situations applied in the circumstances of this case given that the video depicted appellant on his knees "begging" for Officer Castillejos not to harm him. Counsel's questioning further suggested that appellant was merely failing to follow Officer Castillejos's commands, and thus the situation involved "verbal non-compliance" rather than physical non-compliance. In response, Officer Castillejos testified that he acted pursuant to GWPD's policies because appellant was physically noncompliant with his commands, and verbal non-compliance consisted of oral non-compliance, such as telling an officer

18

"no." Officer Castillejos further explained that the manual allowed him to use a taser because appellant posed a threat of bodily harm. "I am all of four feet from a highly-traveled roadway in his position [and] he would be able to very quickly close distance on me and push me into traffic." In this regard, Officer Castillejos testified that appellant was in a "flight-or-fight mode" based on various indicators including appellant's stance, angled slightly away from him, which indicated he might be attempting to conceal a weapon; his failure to comply with commands to lay down; his assumption of a physical position similar to a runner in a starting line; and his constant visual scanning of the area as though he was looking for "either a way out, a direction to run in or . . . situational weapons." Officer Castillejos explained that he is familiar with a common circumstance in which a suspect feigns compliance with an officer's command in order to stall, escape, or attack. He did not believe that appellant's failure to comply and expressed concerns about physical harm were genuine.

Officer Castillejos testified that he tased appellant as the lowest level of force that he could use to obtain appellant's compliance given the totality of the circumstances considering his safety, appellant's safety, and the safety of the motorists on the road at that time. Based on his training and experience, an officer should not wait to deploy a taser until a subject physically attacks because there is a "reactionary gap" to consider. According to Officer Castillejos, "that reactionary gap could have had pretty bad consequences" in the circumstances present in this case.

Appellant's counsel further queried whether Officer Castillejos had properly secured his weapon given that the video failed to include any audible indication that the

secondary retention device on Officer Castillejos's holster had engaged. Counsel thus suggested that his weapon fell out of his holster during the struggle. Officer Castillejos affirmatively stated that his "gun was secure with two levels of retention," that there was no reasonable possibility that his gun was not clipped in, and that mere gravity will engage the second retention device. He stated that appellant landed on top of him when they fell, and that his firearm could not have landed on appellant or his hand. Officer Castillejos testified that from the beginning of the incident to the end, appellant "was actively trying to gain possession of the firearm." He testified that he had no regrets about deploying his taser during the encounter but further explained that, in hindsight, he would have waited for backup to arrive before continuing with the encounter.

Agent Gonzalez also provided some testimony relevant to the facts pertaining to appellant's convictions. Agent Gonzalez testified that appellant was actively "fighting or resisting arrest" during the struggle and was not passively resisting the officers. Agent Gonzalez did not see how Officer Castillejos's firearm came loose from his holster during the struggle; however, Agent Gonzalez explained that he saw appellant in "possession of the weapon." When asked if it was possible that appellant "just accidentally had brushed up against [the firearm] with his hand," Agent Gonzalez denied it, and stated that he "saw [that appellant] had full grip . . . of the weapon." He confirmed that during the struggle, Officer Castillejos was on the ground, appellant fell on top of him, and Agent Gonzalez fell on top of them both. Agent Gonzalez did not see appellant head-butt Officer Castillejos, but he saw that Officer Castillejos was bleeding from his mouth after the incident. Agent Gonzalez further testified that appellant bit him during the struggle,

20

causing a bruise to his arm; however, Agent Gonzalez acknowledged that in his statement, provided shortly after the accident, he told officers that appellant did not bite him, and he did not know how he got the bruise.

Trooper Garcia provided additional testimony about the incident. He confirmed previous testimony that "[a] felony stop consists of our weapons drawn, we order the guys to the ground, or we can order them to our vehicle and handcuff them safely." He explained that officers use their policies and procedures to effect an arrest on a felony stop, and that procedure entails drawing a weapon, ordering the suspect "to the ground" or "to our vehicle," and cuffing the suspect. He has made felony stops on his own, without additional officers, and they comprise the same actions but are "very high stressed" because "[y]ou don't know what is going to happen." Trooper Garcia testified that it is "always recommended" to "wait for backup." However, Trooper Garcia clarified that if he is the first officer on the scene and "time is of the essence," the initial protocol is to "get them in handcuffs quickly." Trooper Garcia confirmed that he saw appellant resisting arrest and "trying to get away."

At this point in the trial, the State rested, and appellant's counsel called Sanchez to testify. Sanchez described his qualifications to the jury and explained that he teaches and trains officers in general police instruction, including the use of force, and specifically, the use of a taser. Sanchez told the jury that the "overarching guiding principle" regarding the use of force is that officers "must use the minimum amount of force necessary to accomplish a legitimate law enforcement goal." Sanchez explained that when a subject fails to comply with an officer's command, the situation is handled through the "use-of-

21

force continuum" beginning with the officer's presence in uniform, which "has an effect on people's behavior," followed by verbal commands, where an officer communicates with the subject attempting to gain compliance, followed by "soft techniques," which Sanchez defined as "laying . . . hands [on] the person to control them but without using impact," followed by "hard techniques," which includes "impact with empty hand fists, baton, pepper spray, conductive energy weapons[,] and any other less than lethal weapon," followed finally by "deadly force."

Sanchez testified that an officer determines how to approach a stop and whether to approach the stop as a felony stop based on a "reasonable basis" that is "dependent on each situation." When asked if it "usually include[s] something more than a suspect being in the vicinity of a possible . . . felony," Sanchez stated that the determination is "situational." He explained that there has to be a "perception" or a report that a suspect is "dangerous or armed." "Usually, the felony stop is a vehicle stop, so it involves pulling the vehicle over, drawing your weapon and giving clear commands and then pulling each subject out of the car one by one in a safe manner, patting them down, securing them until they can be identified and handled according to whatever the nature of the call was." When asked if a felony stop typically encompasses "explaining to the persons involved what is going on," Sanchez stated that "it depends on the particular incident."

Sanchez testified about his experience instructing and training officers regarding the use of firearms, including holstering. He described the three level of retentions employed by standard holsters as: (1) the body of the holster which is designed to prevent a firearm from falling out; (2) as an internal device "that you hear click in" which "grabs

22

the weapon by the ejection port so that it can't be pulled out"; and (3) the "hood" of the holster which flips over the top of the weapon. Sanchez testified that officers are trained to holster using all three retention levels, and he could not "think of a situation where it would be beneficial to halfway holster your weapon. . . . If I'm going to go hands-on with somebody, it's even more important that I put the proper procedures in place." He further explained that depending on the video, "most of the time you can hear the sounds of the weapon being holstered." He explained that he sees officers fail to "holster the entire way" "on a consistent basis" to save time. When he reviews an officer's actions, he looks for "reasonableness," what the officer knew at the time, and whether they followed procedure.

**D.      Evaluation**

As stated previously, appellant asserts that the trial court abused its discretion by: (1) excluding Sanchez's expert testimony regarding the use of force by a taser, and (2) denying appellant the constitutional right to present a defense when it excluded Sanchez's testimony concerning excessive force and self-defense.

Considering the entirety of the record, we conclude that the trial court did not abuse its discretion. As a threshold matter, the trial court did not entirely preclude Sanchez from testifying as an expert, but instead limited his testimony. Sanchez unequivocally told the jury that officers "must use the minimum amount of force necessary to accomplish a legitimate law enforcement goal," and that the "use-of-force continuum" requires officers to use soft techniques, such has physical handling, before employing hard techniques, such as the use of a taser, to gain a subject's compliance. Sanchez's excluded testimony

as delineated in the pretrial hearing and offer of proof was of limited relevance in the context of the entire case given that only one of the three charges against appellant concerned a defense regarding the excessive use of force. *See* TEX. R. EVID. 702; *Kelly*, 824 S.W.2d at 572. Given the other testimony at trial, and the videos of the struggle, the trial court may have reasonably concluded that Sanchez's testimony would not help the jury understand the evidence or determine a disputed fact. *See Vela*, 209 S.W.3d at 131; *Rodgers*, 205 S.W.3d at 527. Further, the trial court may have reasonably concluded that Sanchez was not qualified to testify in an expert capacity about the use of a taser or excessive force given that he had never deployed a taser on a subject nor provided instruction regarding the use of a taser. *See Rhomer*, 569 S.W.3d at 669. In light of the trial court's wide discretion regarding the admissibility of expert testimony, we cannot say that the trial court abused its discretion. *See Rodgers*, 205 S.W.3d at 527–28; *Buford*, 606 S.W.3d at 372. We overrule appellant's first issue.

In his second issue, appellant argues that the trial court denied him a fundamental component of due process—that is—the opportunity to present his defense to the jury. The Texas Rules of Appellate Procedure provide for two different standards for reversible error in criminal cases. If the error is of constitutional magnitude, "the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *See* TEX. R. APP. P. 44.2(a). If the error is non-constitutional, the reviewing court must disregard it unless the error affected the defendant's "substantial rights." *See id.* R. 44.2(b).

24

The erroneous exclusion of evidence generally constitutes non-constitutional error and is reviewed under Rule 44.2(b). *See Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007); *Tillman v. State*, 376 S.W.3d 188, 198 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). However, the erroneous exclusion of evidence can constitute constitutional error when:

> (1)   a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to his defense; or
>
> (2)   a trial court's clearly erroneous ruling results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense.

*Walters*, 247 S.W.3d at 219; *see Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005); *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002); *Potier v. State*, 68 S.W.3d 657, 662, 665 (Tex. Crim. App. 2002). The exclusion of evidence that would only "incrementally" further the defendant's defensive theory is not constitutional error. *Walters*, 247 S.W.3d at 222 (quoting *Ray*, 178 S.W.3d at 836); *see Potier*, 68 S.W.3d at 665–66 ("That [the defendant] was unable to . . . present his case to the extent and in the form he desired is not prejudicial where, as here, he was not prevented from presenting the substance of his defense to the jury." (quoting *United States v. Willie*, 941 F.2d 1384, 1398–99 (10th Cir. 1991)).[3]

---

[3] *Compare Green v. State*, 589 S.W.3d 250, 263 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (concluding that the exclusion of self-defense evidence regarding the decedent's earlier threat against appellant, gang membership, and physical altercations was non-constitutional and "did not influence the jury or had but a slight effect"), *and Vasquez v. State*, 501 S.W.3d 691, 700–01 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (concluding that the exclusion of expert testimony and other evidence did not constitute constitutional error where appellant testified regarding his defense and the charge included an instruction relating to appellant's defensive theory), *and Broussard v. State*, 434 S.W.3d 828, 836 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (concluding that the exclusion of evidence regarding the smell

We disagree with appellant's contention that the trial court's ruling prevented him from presenting a defense. Appellant's counsel focused on Officer Castillejos's actions and use of force throughout the case. In voir dire, appellant's counsel questioned the jury panel if they believed that "officers . . . can use excessive force sometimes," and in opening argument, appellant's counsel described the events at issue as resulting from the "tragic consequences of what happens when an officer ignores and neglects his knowledge, training[,] and experience." During trial, appellant's counsel methodically cross-examined Officer Castillejos regarding his actions and his compliance with the policies and procedures of GWPD regarding force and the use of a taser, and further cross-examined Agent Gonzalez and Trooper Garcia regarding their perception of the events, including appellant's actions and Officer Castillejos's use of force. Appellant's counsel displayed and discussed the videos of the incident with the witnesses, and in so doing, characterized appellant's actions as motivated by fear and apprehension. Further, appellant's counsel presented the testimony of Sanchez, as described above, regarding the use of force.

In closing argument, appellant's counsel explicitly discussed the jury's instruction regarding the use of excessive force, and argued that officers were "held to a certain standard"; that "[t]here are certain instances where [officers] can use a certain level of force, and there are certain instances where they cannot"; that Officer Castillejos

of an herbal alternative to marijuana was non constitutional and did not have a substantial and injurious effect on the verdict), *with Wilson v. State*, 451 S.W.3d 880, 884 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (concluding that the exclusion of evidence of appellant's "good character for moral and safe conduct around young children" was constitutional error and raised reasonable doubt).

effectively pulled a gun on a pedestrian; "that there was definitely excessive force being used"; that deploying a taser multiple times constituted excessive force; and that appellant was confused and "scared for his life." Appellant's counsel specifically argued that Officer Castillejos did not follow and "ignore[d] and neglect[ed]" "his knowledge, training[,] and experience" during the encounter. We conclude that appellant was not effectively prevented from presenting his defensive theory, and Sanchez's excluded testimony would have only incrementally furthered that defensive theory. *See Tillman*, 376 S.W.3d at 198–99 (concluding that appellant was not prevented from presenting a defense when the trial court excluded his expert because he was able to challenge the reliability of police identification procedures through cross-examination and closing arguments). Therefore, any alleged error in excluding Sanchez's testimony was non-constitutional. *See Walters*, 247 S.W.3d at 219; *Ray*, 178 S.W.3d at 835.

"Non-constitutional errors require reversal only if they affect an appellant's substantial rights—i.e., when they have a substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023); *see* TEX. R. APP. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). To determine if the jury's decision was affected by the error, we consider the entire record, including the admitted evidence, the nature of the evidence supporting the verdict, the character of the alleged error, how the error might be considered in connection with other evidence, the jury instructions, the parties' theories of the case, closing arguments, voir dire, and whether the State emphasized the error. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *Green v. State*, 589 S.W.3d 250, 261 (Tex. App.—Houston

27

[14th Dist.] 2019, pet. ref'd).

Here, the jury saw two body camera videos depicting Officer Castillejos's interactions with appellant. The video from Officer Castillejos's shows that appellant failed to comply with Officer Castillejos's repeated and increasingly strenuous commands to lay flat on the ground and includes Officer Castillejos's explicit warnings that he would deploy the taser if appellant did not lay flat. Although appellant's counsel characterized appellant's behavior as extremely fearful and confused, Officer Castillejos disagreed with this characterization and testified that appellant's expressed concerns about physical harm were disingenuous. Ultimately, the jury witnessed this interaction, and the video clearly depicts appellant's demeanor and body language. The jury could choose to believe or to disbelieve appellant and could choose to accept or to reject his expert's opinions. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (stating that the "credibility determination" of defensive evidence "is solely within the jury's province").

While the video of the struggle between Officer Castillejos, appellant, and Agent Gonzalez is unclear, both Officer Castillejos and Agent Gonzalez testified that appellant intentionally seized Officer Castillejos's firearm during the struggle and rejected any possibility that appellant's contact with the firearm was a fortuitous event caused by a failure to properly holster the firearm. Further, the jury saw a still photograph captured from the video depicting a hand, identified as appellant's, on the firearm. Both Officer Castillejos and Agent Gonzalez testified that appellant actively resisted their attempts to handcuff him. Officer Castillejos testified that appellant head-butted him during the struggle, and although Agent Gonzalez did not see it happen, he confirmed that Officer

28

Castillejos was bleeding from the mouth after the incident.

Based on the foregoing, we conclude that the trial court's alleged error, if any, did not affect appellant's substantial rights, and did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Cook*, 665 S.W.3d at 599. Accordingly, we overrule appellant's second issue.

## IV.    CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
16th day of November, 2023.

29