# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-22-00539-CR

**Brian Scott Sharp, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
## NO. CR2020-730, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After considering the motion for rehearing filed by appellant Brian Scott Sharp and the State's response, we deny the motion for rehearing but withdraw our opinion and judgment issued on December 20, 2023, and substitute the following opinion and judgment in their place.

A jury found Brian Scott Sharp guilty of the first-degree felony offenses of attempted capital murder of a peace officer, *see* Tex. Penal Code §§ 15.01, 19.03, and aggravated assault against a public servant, *see id.* § 22.02(b)(2)(B). In two appellate issues, Sharp contends that the trial court and the prosecutor violated the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 10 of the Texas Constitution. *See* U.S. Const.

amends. VI, XIV; Tex. Const. art. I, § 10.  Sharp contends that the trial court should have given

the jury a self-defense instruction and that the prosecutor improperly introduced evidence during

closing arguments.  For the following reasons, we modify the judgments of conviction to correct

clerical errors and affirm the judgments of conviction as modified.

## BACKGROUND[1]

In the middle of the day on August 20, 2020, Deputies Eddy Luna, Nicholas Nolte, and Rene Luna with the Comal County Sheriff's Office were on Sharp's property to execute a felony arrest warrant on him at his house.  Deputies Eddy Luna and Nolte had been unsuccessful in executing the warrant on two prior occasions.  On their first attempt, the deputies spoke with Sharp's son, who lived with his father and was outside the house on the property.  The son told the deputies that he was not sure if Sharp was home, but when they knocked on the door, it was "locked from the inside," so they "had a pretty good idea somebody was there and nobody was going to come out."  They told Sharp's son that Sharp had a warrant for his arrest, that he needed to take care of it, and that they would be coming back.  On their second attempt, they knocked on the door, but no one answered.  Deputy Nolte walked around to the back of the house where he found "several large weed plants," and when he returned to the front of the house, the deputies "heard something out the back."  They moved to the back and observed that the plants had been uprooted and thrown over the fence.  At that point, they "knew [Sharp] was gone" and that they had "missed him again."

---

[1]  Because the parties are familiar with the facts of the case, its procedural history, and the evidence adduced at trial, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it.  *See* Tex. R. App. P. 47.1, .4.

On their third attempt, which was on August 20, 2020, the deputies approached Sharp's house on foot from different directions, and, as he was walking up the driveway, Deputy Eddy Luna saw "a person who looked just like Brian Sharp" with his dog outside. The "dog alerted," and Sharp "ran inside the house and locked the door behind him." The deputies, who were in uniform, knocked on the house's doors and windows, advised Sharp through the doors and windows that they were from the sheriff's office and were there to serve the felony arrest warrant, and directed Sharp to come out of the house. Sharp did not comply with the deputies' directive but stayed inside the house and covered up windows with paper and cardboard.

For about one hour, the deputies continued to announce who they were and why they were there, knock on the doors and windows, and direct Sharp to come outside. After about one hour, the deputies attempted to remove the covering from a window, and Sharp began talking to them through the window and asked to see the warrant. The deputies attempted to show him an electronic copy of the warrant through the window and continued to direct him to come out of the house. They advised him that if he did not come out, they were "going to come in one way or the other" and were "not going to leave today without [him]." Sharp continued to refuse to come out and through the window called them "trespassers" and "wrongdoers." He also told them that they had been warned and to leave the property. After approximately thirty more minutes and obtaining approval from their sergeant, Deputy Nolte hit a sledgehammer against one of the doors and then kicked it open with his foot.[2] As the door opened, Deputies

---

[2] Sharp testified that when the deputies were hitting his door with the sledgehammer, he thought that it was gunfire, but he later agreed that they were not shooting at him.

3

Nolte and Eddy Luna were next to each other in the doorway, Deputy Eddy Luna drew his gun,[3] and Sharp shot Deputy Eddy Luna in the arm with a shotgun. After the shooting, Sharp surrendered and was arrested at the scene.

Sharp was indicted for two counts of aggravated assault against a public servant and two counts of attempted capital murder of a peace officer. During the jury trial, the State waived Count I, aggravated assault against a public servant (Eddy Luna), and Count IV, attempted capital murder of a peace officer (Nicholas Nolte). The State's witnesses at trial included the three deputies and a crime scene specialist who collected evidence at the scene. The evidence showed that Deputy Eddy Luna lost a substantial amount of blood and was at risk of losing his life from the shotgun wounds. Deputy Rene Luna applied a tourniquet at the scene to slow the loss of blood, but Deputy Eddy Luna's right arm ultimately had to be amputated. The State's exhibits included video recordings from the body cameras of Deputies Rene Luna and Nolte that captured the incident; photographs; and physical evidence collected at the scene, including Sharp's shotgun and notebook.

The defense's theories at trial were that the deputies mishandled the situation and violated their policies by not seeking assistance from the crisis negotiation team or the Special Weapons and Tactics Team (S.W.A.T.) and that Sharp acted in self-defense when he shot his shotgun by "instinct" when the deputies kicked in his door. Sharp testified in his own defense, and the defense's exhibits included a chapter on special operations from the sheriff's office's policy manual. Sharp admitted that he knew the deputies were law enforcement officers, that he was aware they were at his house to execute the arrest warrant, and that they directed him to

---

[3] Deputy Eddy Luna testified that he placed his gun into a "sul position, kind of a resting position on [his] chest."

4

come out of the house, but he testified that he acted out of self-defense to knock the gun out of Deputy Eddy Luna's hand when the door was kicked open. He testified that Deputy Eddy Luna had his gun pointed at Sharp; that "[their] eyes met"; and that at that moment, he "thought [he] was going to die" and that he "was going to get shot. No doubt in [his] mind." He compared the situation to the "videos of the police shooting people."

Sharp disputed seeing the deputies when he was outside his house. He testified that when the deputies "very first came up to his property," he looked out of his window and saw "armed men" and the barrel of a gun pointing in the window; that they were "aiming guns" at him; that they were banging the barrels of their pistols on the windows; and that "it scared [him] to death." He admitted that he had been outside calling his dog and that he locked the door when he went back inside because that is what he "always" did but testified that his windows "were already covered up."

Sharp requested a self-defense instruction, but the trial court denied his request. The jury found Sharp guilty of Count II, attempted capital murder of a peace officer (Eddy Luna), *see* Tex. Penal Code §§ 15.01 (addressing "criminal attempt"), 19.03 (stating elements of capital murder), and Count III, aggravated assault against a public servant (Nicholas Nolte), *see id.* §§ 22.01(a)(2) (stating that person commits offense of assault if person "intentionally or knowingly threatens another with imminent bodily injury"), 22.02(b)(2)(B) (stating that offense of aggravated assault is first-degree felony when offense is committed against "person the actor knows is a public servant while the public servant is lawfully discharging an official duty").

In the punishment phase of trial, the jury assessed fifty-five years' confinement and a $10,000 fine for Count II and twenty-five years' confinement and a $10,000 fine for

Count III.  The trial court signed judgments of conviction in accordance with the jury's verdicts and ordered the sentences to run concurrently.  This appeal followed.

## ANALYSIS

**Jury Charge**

In his first issue, Sharp argues that the trial court erred and violated the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 10 of the Texas Constitution when it did not include a self-defense instruction in the jury charge.  *See* U.S. Const. amends. VI (addressing rights of accused), XIV, § 1 (prohibiting states from depriving person of liberty without due process of law); Tex. Const. art. I, § 10 (addressing rights of accused).

*Standard of Review and Applicable Law*

We review alleged jury charge error in two steps:  first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal.  *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  The degree of harm required for reversal depends on whether the jury charge error was preserved in the trial court.  *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury charge error).  If the complaint about jury charge error was preserved in the trial court, "then reversal is required if there was some harm to the defendant."  *Marshall*, 479 S.W.3d at 843.

In this case, the trial court denied Sharp's request for an instruction on a defensive issue.  "A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong," unimpeached or contradicted, and "regardless of how

6

the trial court views the credibility of the defense." *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013) (citing *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008)). A defendant "'bears the burden of production' with respect to a defense," *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007) (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)), and "[t]he issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense," *Kuhn v. State*, 393 S.W.3d 519, 532 (Tex. App.—Austin 2013, pet. ref'd) (quoting Tex. Penal Code § 2.03(c)); *see Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007) (discussing when defendant is entitled to jury instruction on defensive issue); *Shaw*, 243 S.W.3d at 657 (describing "burden of production" as "burden of making a prima facie case").

"[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw*, 243 S.W.3d at 657–58; *see Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010) ("The defendant bears the burden of showing that each element of the defense has been satisfied."). In determining whether a defense is supported by the evidence, the court views the evidence in the light most favorable to the defendant's requested jury instruction, *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020), and relies "on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven," *Shaw*, 243 S.W.3d at 658.

*Did the trial court err by denying Sharp's request for a self-defense instruction?*

In this case, the evidence was that Sharp used deadly force. "A person is justified in using deadly force against another: (1) if the actor would be justified in using force against the

other under Section 9.31 [of the Texas Penal Code] and (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force." Tex. Penal Code § 9.32(a). Generally, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).

Sharp does not contest that the deputies were on his property to execute a felony arrest warrant and that he refused to follow their directive to come out of his house. *See* Tex. Code Crim. Proc. art. 15.01 (stating that "warrant of arrest" is written order directed to peace officer "commanding him to take the body of the person accused of an offense, to be dealt with according to law"). In the context of resisting arrest that an actor "knows is being made by a peace officer" even if the arrest is "unlawful," the "use of force against another is not justified" unless:

> (1) if, *before the actor offers any resistance*, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest . . . ; and

> (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.

Tex. Penal Code § 9.31(b)(2), (c) (emphasis added).

To be entitled to a self-defense instruction under the plain language of these statutory provisions, it was Sharp's burden to present some evidence that the deputies used "unlawful force" and that before he offered "any resistance," the deputies used or attempted "to use greater force than necessary to make the arrest." *See id.* § 9.31(a), (b)(2), (c); *Lopez v. State*,

8

600 S.W.3d 43, 45 (Tex. Crim. App. 2020) (discussing court's construction of statute's "plain meaning" and explaining that court generally construes "each word, phrase, clause and sentence" in context and "according to the rules of grammar and common usage"); *Lang v. State*, 561 S.W.3d 174, 179–80 (Tex. Crim. App. 2018) (explaining that courts "ordinarily give effect to plain meaning" when interpreting statutes).**4**  And because Sharp used deadly force, it was his burden to present evidence that he reasonably believed that deadly force was "immediately necessary" to protect himself against the deputies' "use or attempted use of unlawful deadly force."  *See* Tex. Penal Code § 9.32(a)(2)(A); *see also id.* § 1.07(a)(42) (defining "reasonable belief" from perspective of "ordinary and prudent man in the same circumstances as the actor").

Sharp argues that it was for the jury to decide whether Deputy Eddy Luna "used greater force than necessary" and whether Sharp's "beliefs, fears, and actions were reasonable." Sharp relies on his testimony that the officers pointed their guns at the house and through windows and banged the barrels of the guns on the windows, that Deputy Eddy Luna pointed his gun at Sharp when the door opened, that Sharp thought the deputies were "shooting at him," that he shot his shotgun by "instinct" because he was afraid for his life, and that he did not intend to resist arrest when he shot the deputy.  But Sharp's testimony, assuming it is credible, does not

---

**4** As part of his first appellate issue, Sharp argues that the trial court based its denial of the self-defense instruction on a misstatement of the law regarding resisting arrest.  He relies on Texas Penal Code Section 38.03, which addresses the offense of resisting arrest.  *See* Tex. Penal Code § 38.03.  But that Section is not inconsistent with our analysis here because it concerns a person committing a separate offense when the person uses force to resist arrest.  In addition to the element of "intentionally prevent[ing] or obstruct[ing] a person he knows is a peace officer . . . from effecting an arrest," the offense's elements include "using force against the peace officer or another."  *See id.*; *see also Dobbs v. State*, 434 S.W.3d 166, 170–73 (Tex. Crim. App. 2014) (discussing elements of resisting arrest statute).  In other words, a person who resists arrest without using force against a peace officer or another has not committed an offense under Section 38.03, but it does not follow that resisting arrest only encompasses using force against the officer or another.

9

support reasonable inferences that the deputies used unlawful force against Sharp, that he reasonably believed that deadly force was "immediately necessary" to protect himself against the deputies' "use or attempted use of unlawful deadly force" when he shot the shotgun, or that they "used or attempted to use greater force than necessary" before Sharp resisted being arrested.

"In making an arrest, all reasonable means are permitted to be used to effect it." Tex. Code Crim. Proc. art. 15.24. Although an officer should only use the amount of force that "is necessary to secure the arrest and detention of the accused," *see id.*, in the case of a felony, an "officer may break down the door of any house for the purposes of making an arrest, if he be refused admittance after giving notice of his authority and purpose," *id.* art. 15.25. An officer also is not required to have an arrest warrant in his possession when making an arrest. *Id.* art. 15.26. The deputies' testimony and the video recordings from the body cameras show the deputies directing Sharp to come out of the house because of the arrest warrant, attempting to show him an electronic copy of the warrant, and warning him that they would be coming into his house if he did not comply with their directive. The evidence was undisputed that the deputies identified themselves and why they were there—to execute the felony warrant of arrest—and directed him to come out of the house for over an hour before kicking the door open.

Further, crediting Sharp's testimony that the deputies were banging their guns on the windows or doors and that Deputy Eddy Luna was pointing his gun at Sharp when the door opened, these actions would not have been unlawful. An officer's knocking on doors and windows in an effort to serve an arrest warrant does not amount to unlawful force, and the evidence was undisputed that the deputies did not discharge their firearms at any time during the incident. *See Porteous v. State*, 259 S.W.3d 741, 747–48 (Tex. App.—Houston [1st Dist.] 2007, pet. dism'd) (affirming trial court's denial of defendant's request for self-defense instruction and

10

observing that although there was evidence that defendant was afraid officer was going to shoot him and that officer had drawn his gun, defendant "presented no evidence that [the officer] used greater force than necessary to arrest [the defendant]"). As our sister court observed, "[o]ne may not assume that the threatened use of force by a peace officer will become more than a threat or that the use of such force will be greater than necessary to effect an arrest." *Id.* at 748; *see Walker v. State*, 994 S.W.2d 199, 202 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (affirming trial court's denial of self-defense instruction, observing that "there was some evidence that tended to show that appellant was merely trying to disarm the police officer when [appellant] shot him" but that there was no evidence that officer used or attempted to use excessive force when officer drew weapon and ordered appellant to stay on ground, and explaining that appellant was "not entitled to assume" that "[officer's] threatened use of force would have escalated to an excessive use of force"); *see also, e.g.*, *Mays v. State*, 318 S.W.3d 368, 383 (Tex. Crim. App. 2010) (explaining that "appellant cannot rely upon evidence of his paranoia and psychotic thinking to raise a 'reasonable' mistaken belief concerning the officers' intentions"). Further, to the extent Sharp relies on his testimony that he believed the deputies had fired their guns prior to the door being opened, this testimony was in the context of the officers' use of the sledgehammer to open the door, which the evidence conclusively established was after Sharp had resisted arrest. *See* Tex. Penal Code § 9.31(c)(1).

Because the record does not reflect evidence that would support a rational finding on each of the applicable elements of self-defense in this case, we conclude that Sharp was not entitled to an instruction on the issue. *See id.* §§ 9.31, .32; *Juarez*, 308 S.W.3d at 404 (stating that "defendant bears the burden of showing that each element of the defense has been satisfied"); *Shaw*, 243 S.W.3d at 657–58 (requiring some evidence of each element of defense

11

that, if believed, would support rational inference that element is true); *Kuhn*, 393 S.W.3d at 532 ("The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense."). On this basis, we overrule Sharp's first issue.

**Prosecutor's Closing Argument**

In his second issue, Sharp argues that the prosecutor introduced evidence during closing argument in violation of the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 10 of the Texas Constitution. *See* U.S. Const. amends. VI, XIV, § 1; Tex. Const. art. I, § 10. Sharp contends that in the following portion of his closing argument, the prosecutor "injected a new and harmful fact into the case" when he referenced that Sharp's shotgun had "Ed written right on the bottom":

> The one thing that has kind of haunted me in all of this that you haven't seen yet—and I don't understand it. I wasn't going to ask [Sharp] about it. I don't know what his response would be, but you heard him tell you he bought this [the shotgun]. He's owned this for years. He's maybe shot it a handful of times.
>
> You know, when you look at it, you see Ed written on the bottom. It's really weird. We know his sons' names are Dylan and Conner. We know his name is Brian. But for some reason he's got Ed written right on the bottom of this thing. We know he was writing that day in his journal and on his body and here it is written on the bottom of the gun that he's owned for years.

The prosecutor made this argument immediately after referencing the evidence that the jury could consider and advising the jury that it could "pore through all of this evidence." The evidence admitted at trial included the shotgun and Sharp's notebook.

Sharp did not object to the prosecutor's argument or raise the complaint that he raises here at trial. "To preserve a complaint about improper jury argument for appellate review, a defendant must object and pursue the objection to an adverse ruling." *Owens v. State*,

549 S.W.3d 735, 744 (Tex. App.—Austin 2017, pet. ref'd) (citing *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)); *see* Tex. R. App. P. 33.1(a) (stating required steps to preserve complaint for appellate review); *Proenza v. State*, 541 S.W.3d 786, 808 (Tex. Crim. App. 2017) ("Almost all error—even constitutional error—may be forfeited if the appellant fails to object." (citing *Fuller v. State*, 253 S.W.3d 220, 232 & n.48 (Tex. Crim. App. 2008))); *Hooper v. State*, 106 S.W.3d 270, 273 (Tex. App.—Austin 2003, no pet.) (stating that as general rule, trial counsel must object or otherwise preserve error, "even if [error] is 'incurable' or 'constitutional'" (citing *Cockrell*, 933 S.W.2d at 89)). Because Sharp did not object to the prosecutor's argument or raise the complaint with the trial court that he raises on appeal, he has not preserved this issue for our review. *See* Tex. R. App. P. 33.1(a); *Owens*, 549 S.W.3d at 744.

Further, even if Sharp had preserved this complaint, we would conclude that the prosecutor's closing argument was not improper. *See Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (stating that "reasonable deduction from the evidence" is proper jury argument). Sharp argues that the prosecutor's closing argument injected new facts, but his shotgun and journal were available for the jury's review as they were in evidence. Given this evidence, we conclude that the prosecutor's argument about the shotgun was a reasonable deduction from the evidence. *See id.*

For these reasons, we overrule this issue.

**Clerical Error in Judgments**

In the judgment of conviction for Count II, attempted capital murder of a peace officer, the "Statute for Offense" incorrectly lists "22.02(b)(2)(B) Penal Code," and in the

13

judgment of conviction for Count III, aggravated assault against a public servant, the "Statute for Offense" incorrectly lists "15.01/19.03 Penal Code."

This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b) (authorizing court of appeals to modify trial court's judgment and affirm it as modified); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (concluding that Texas Rules of Appellate Procedure empower courts of appeals to reform judgments). Accordingly, we modify the judgment of conviction for Count II, attempted capital murder of a peace officer, to reflect that the "Statute for Offense" is "15.01/19.03 Penal Code" and the judgment of conviction for Count III, aggravated assault against a public servant, to reflect that the "Statute for Offense" is "22.02(b)(2)(B) Penal Code."[5]

## CONCLUSION

Having overruled Sharp's issues but concluding that the judgments contain non-reversible clerical errors, we modify the judgments as described above and affirm the judgments of conviction as modified.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Modified and, As Modified, Affirmed on Motion for Rehearing

Filed: April 11, 2024

Do Not Publish

_____

[5] The trial court signed nunc pro tunc judgments to correct other clerical errors in the judgments of convictions, but it did not correct the clerical errors in the judgments concerning the applicable statutes for the offenses.

14